*The Grapeshot* (9 Wallace, 129) affirmed on the second point adjudged therein (pp. 138–141); and the doctrine again declared, that in the case of a lien asserted against a vessel supplied or repaired in a foreign port, necessity for credit must be presumed where it appears that the repairs and supplies for which a lien is set up were ordered by the master, and that they were necessary for the ship when lying in port, or to fit her for an intended voyage, unless it is shown that the master had funds, or that the owners had sufficient credit, and that the repairer, furnisher, or lender knew those facts, or one of them, or that such facts and circumstances were known to them as were sufficient to put them on inquiry, and to show that if they had used due diligence they would have ascertained that the master was not authorized to obtain any such relief on the credit of the vessel.

APPEAL from the Circuit Court for the District of Maryland.

This was a suit in admiralty to enforce a lien claimed upon the steamer Lulu for repairs made upon her at the request of the master. It was consolidated with other suits, all brought by material men for supplies or repairs to the vessel to the extent of $8796.21.

The steam vessel was owned in New York, which was her home port, but employed in the trade between Baltimore, in Maryland, and Charleston, in South Carolina. When the libel was filed she had been plying in the trade about eleven months, that is to say, from April, 1866, to March, 1867. The repairs and supplies for which satisfaction was sought were furnished in Baltimore during and after July, 1866, but chiefly in November and afterwards, at

fair prices, and were proper and necessary; and there was *no proof whatever* that the master had any funds which he could have applied to procure the repairs and supplies.

In each suit a New York company filed a claim and answer, asserting a prior right to satisfaction out of the proceeds of the steamer, which under an order of the court had been sold, bringing but $10,250. The claim of this company was founded upon a bill of sale, made to it by the former owners of the vessel (residents of New York also), in consideration of an advance of $12,000, on the 24th of August, 1866. This bill of sale, though in form absolute, was intended as a mortgage to secure repayment of the advance in six months from the date, but no part of it had been repaid.

The only question in the case was: "Were the repairs and supplies in question furnished under such circumstances as would entitle the material men to the liens which they claimed?" If they were, this lien was superior to that created by the bill of sale or mortgage, whether prior or posterior in time, and the mortgage or most of it was cut out.

The District Court, in which the libel was originally filed, decreed for the material men; but the case coming before the Circuit Court, held by the Chief Justice in November, 1868, and therefore before the recent judgment in *The Grapeshot*,[*] which explained what had been received as law since *The Laura*[†] (*Thomas* v. *Osborn*), and more particularly since *The Sultana*[‡] (*Pratt* v. *Reed*), in which last case the court stated the rule thus:

"The proof of a necessity at the time of procuring a supply for a credit on the vessel . . . is as essential as that of the necessity of the article itself. . . . It is only under very special circumstances, and in an unforeseen and unexpected emergency, that an implied maritime hypothecation can be created"—

and put the decision of the case upon the ground, not that the supplies were not necessary, but that there was no sufficient *proof* of necessity for the implied hypothecation of the vessel, or of any unexpected or unforeseen exigency

---

[*] 9 Wallace, 129.        [†] 19 Howard, 28.        [‡] Ib. 359.

that required it—the Circuit Court finding itself "unable to make any distinction which had substance" between that case and the present, felt "constrained" to reverse the decree, and with obvious reluctance deprived the material men of their lien.

The case was now here on appeal from that reversal, the case of *The Grapeshot* being in the meantime decided, and deciding that if there have been,

. 1. A necessity for the repairs—

2. If the credit have been given to the ship and not to the owner, master, or agent—

3. Then a presumption of necessity for the credit will arise, conclusive, in the absence of evidence to the contrary, if the material man has acted in good faith.

*Messrs. Orville Horwitz and G. H. Williams, for the material men, appellants,* relied on the case of *The Grapeshot,* decided, as above-mentioned, since the reversal below, a reversal, as they said, made only in deference to old authorities, now overruled or explained away by that more recent case. This was the end of the matter.

But, independently of that, the vessel was mortgaged in August, 1866, by the owners to the claimants, for about $2000 more than she was worth, according to the result of the sale. This mortgage was overdue and unpaid at the time of the libels filed. So that at the time of the repairs, confessedly needed, the owners had created a mortgage over and above the value of the steamer, which they had been unable to liquidate, and the effort here is to appropriate the labor and materials of the libellants towards the payment of that mortgage. Suppose that the onus of showing that the necessity for credit to the ship existed still remained on the libellants, the facts prove that those owners could have obtained no credit in a strange city on their personal responsibility.

*Mr. William Meade Addison, contra:*

Maritime liens are given but in the interests of commerce, and are not favored by the courts. They are allowed only

Argument against the lien.

from the necessities to which vessels in *foreign* ports may be exposed. In their origin they were never designed to apply to vessels in their own country, nor ought they now to apply to those vessels, which, though in reality belonging to a common country, are, by a pure fiction, deemed foreign vessels because owned by citizens of other States than those where they chance to be, except in cases of extreme neces-sity. It was a mooted question, until the decision, A.D. 1819, in *The General Smith*,* whether the ships of one State were foreign as to another. If the question were a new one, now for the first time to be decided, a different rule perhaps would govern. Certainly in a country of *United States*, States separated often only by rivers, each State having ports di-rectly in face of ports of the other, nothing seems more unreasonable than *now* to regard one port as foreign to the other. The great vessels of New York now have their docks at Jersey City opposite, for convenience, as those of Phila-delphia have theirs at Camden, New Jersey, also opposite, for the same cause. How unreasonable to say that Jersey City is a port foreign to New York, and that of Camden foreign to the port of Philadelphia! And since *The General Smith* was decided, telegraphs and railways have changed the whole ground, even as to ports far separated, on which it was rested. Indeed, if there be anything that is especially National, and withdrawn from the operation of State laws, it is a vessel whose home is *a port*, not a State; whose flag is that of the Union, and not of any State; where National officers watch her, and control her, and tax her, and National custom-houses constitute the repositories of her papers.

Still with the safeguards thrown around the subject by the two decisions which it is said that *The Grapeshot* has explained away and overruled, we might admit that ships in one State are foreign as to another. The difficulty of creating a valid lien obliged the material man to inquire. *Presump-tions* were against him, not in his favor. But if all old safe-guards are thrown overboard, as it is said they are by *The*

* 4 Wheaton, 443.

*Grapeshot*, there is great reason for treating as *foreign* ports only those ports which are so in fact, and of considering the power vested in a master to impawn his owner's ship or goods for necessaries furnished in a foreign port, as what it was originally declared to be, "*a legal indulgence founded on the urgency* of the case, and intended for the general benefit of commerce,"* and of obliging the person disposed and perhaps eager to trust, to show that he had inquired in the ship's home port as to whether the master had funds.

Again: "Where money," says Mr. Justice Bee, "is borrowed on a ship before the voyage is begun, she is not answerable in the admiralty. The law means to favor the *completion, not the commencement* of a voyage."† Now, the Lulu while obtaining necessaries in the port of Baltimore must have made not less than eleven distinct voyages to Charleston and back. These repairs and supplies were all made, in the language above quoted, not "*to favor the completion of a voyage,*" but "*the commencement*" of eleven distinct voyages.

To sustain a lien under such circumstances would be an innovation upon the ancient and well-established principles of the admiralty law. It will have no precedent to support it; and arrayed against it are the principles of sound maritime policy and commercial fair dealing. This court in *The Grapeshot* in no wise impairs the force of its language, in *Pratt* v. *Reid*, where it says:

"These maritime liens in the coasting business, and in the business upon the lakes and rivers, are greatly increasing, and as they are tacit and secret, are not to be encouraged, but should be strictly limited to the necessities of commerce which created them. Any relaxation of this law in this respect, will tend to perplex and embarrass business rather than furnish facilities to carry it forward."

Mr. Justice CLIFFORD delivered the opinion of the court.

Experience shows that ships and vessels employed in commerce and navigation often need repairs and supplies in

---

* Boreal *v.* Golden Rose, Bee, 132.                          † Ib.

course of a voyage, when the owners of the same are absent, and at times and places when and where the master may be without funds, and may find it impracticable to communicate seasonably with the owners of the vessel upon the subject.

Contracts for repairs and supplies, under such circumstances, may be made by the master to enable the vessel to proceed on her voyage, and if the repairs and supplies were necessary for that purpose, and were made and furnished to a foreign vessel or to a vessel of the United States in a port other than a port of the State where the vessel belongs, the *primâ facie* presumption is that the repairs and supplies were made and furnished on the credit of the vessel unless the contrary appears from the evidence in the case.

Where it appears that the repairs and supplies were necessary to enable the vessel to proceed on her voyage, and that they were made and furnished in good faith, the presumption is that the vessel, as well as the master and owners, is responsible to those who made the repairs and furnished the supplies, unless it appears that the master had funds on hand, or at his command, which he ought to have applied to the accomplishment of those objects, and that they knew that such was the fact, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry and to show that if they had used due diligence in that behalf they might have ascertained that the master, under the rules of the maritime law, had no authority to contract for the repairs and supplies on the credit of the vessel.

Repairs and supplies amounting to eight thousand seven hundred and ninety-six dollars and twenty-one cents, as adjudged by the District Court, were made and furnished by the various parties mentioned in the record to the steamship Lulu, at the request of her master, while she was lying in the port of Baltimore, and the owners of the steamer refusing to pay for the same, those several parties, including the appellants in this case, filed separate libels against the steamer in the District Court to recover the amount of their

respective claims. Monitions were issued in the several suits, and the steamer was arrested to answer to the allegations of the respective libels.

Appearance was entered in each suit by the owners of the steamer as claimants, and on their petition, and pursuant to the order of the court, the steamer was sold by the marshal and the proceeds of the sale were paid into the registry of the court to abide such further order of the court as might be made in the respective causes.

Answers were filed by the claimants to the several libels and the suits were subsequently consolidated, and the order of the court was to the effect that they should be heard together.

Testimony was taken on both sides and the District Court entered a decree that the several libels filed in the case, except one, "be allowed as liens against the steamer to the amount of the respective claims," and by the decree of distribution the court awarded to the appellants the sum of two thousand three hundred and thirty-seven dollars and forty-six cents, as appears of record.

Appeal was taken from that decree by the claimants to the Circuit Court for the same district, where the parties were again heard, and the Circuit Court reversed the decree of the District Court and ordered, adjudged, and decreed that so much of the fund in the registry of the court as was applicable to the payment of the appellant's claim, under the decree of the District Court, should be paid to the claimants as the owners of the steamer. Dissatisfied with that decree the libellants appealed from the same to this court, and now insist that it ought to be reversed.

Prior to the twenty-fourth of August, 1866, the title to the steamer was in the grantors of the claimants, but the claimants admit, in their answers, that their grantors, as well as themselves, were residents of New York, and that the port of New York was the home port of the steamer. Whatever title they have was acquired by virtue of a bill of sale executed on that day, and the record shows that it is duly recorded in the custom-house of that port. Although

the bill of sale is absolute in form the claimants allege that it was intended only as a mortgage, but the fact alleged is of no importance in the decision of the case, as it is admitted that the former owners, as well as the claimants, were residents of a State other than the one where the repairs were made and the supplies furnished, and that the steamer belonged to a port of the State where her owners resided.

When arrested the steamer had been engaged for a period of eleven months in carrying passengers and freight between the ports of Baltimore, in the State of Maryland, and Charleston, in the State of South Carolina, and the evidence is full to the point that the repairs made and the supplies furnished were necessary to enable the steamer to continue to make her regular trips between those ports and to fulfil the obligations to the travelling and commercial public which her owners had contracted. Argument upon that topic is quite unnecessary, as the point is conceded by the claimants, but they deny that the repairs and supplies were made and furnished on the credit of the steamer, or that the evidence shows that there was any necessity for any such credit to the steamer. Full proof is exhibited that the repairs were made and the supplies furnished in the several cases at the request of the master, and there is no proof whatever that he had any funds which he ought to have applied, or which he could have applied, to accomplish those objects or any other.

Attempt is made to show that the agent of the steamer had funds derived from freight which might have been so applied, but the evidence in the case fails to establish that theory and satisfies the court that he had no funds of the owners and that he was not under any obligations to grant them any further credit for that purpose.

Unless the repairs or supplies, as the case may be, are necessary to render the ship or vessel seaworthy or to enable her to prosecute her voyage, it is quite clear that the master, as between himself and the owners, is not authorized to make any such contracts or purchases either on the credit

of the vessel or her owners. Such necessity usually arises when the ship or vessel is in a port distant from the owners, and oftentimes when they have no knowledge or means of knowledge as to the actual condition of the vessel, and it is chiefly for that reason that the authority is reposed in the master to act in their behalf and for the best interest of all concerned, but it should be borne in mind that his authority in that respect is limited to the circle of duties which that necessity requires should be performed before the owners can be consulted.

Merchants are not obliged to make advances to the master, nor to make repairs or furnish supplies at his request, and before they can safely do so they should be reasonably satisfied that the vessel needs what the master requests them to make and furnish, as the law supposes that the vessel is in the port where the request is made, and that they have the opportunity of making due inquiry and investigation upon that point.*

Subject to that limitation the master is the agent of the owners for the voyage, and they are bound to the performance of all lawful contracts made by him relative to the usual employment of the ship and for repairs made and supplies furnished for her use in a foreign port.†

Ports of States, other than those of the State where the vessel belongs, are for that purpose considered as foreign ports, and the authority of the master in contracting for repairs and supplies is not confined to such as are absolutely or indispensably necessary, but includes also all such as are reasonably fit and proper for the ship and the voyage. Where such repairs and supplies are reasonably fit and proper the master, if he has not funds and cannot obtain such on the personal credit of the owners, may obtain the same on the credit of the ship, either with or without giving a bottomry bond, as necessity shall dictate. Reasonable dili-

---

* 2 Parsons on Shipping, 329; Bold Buccleuch, 7 Moore, Privy Council, 284; Roberts on Admiralty, 395.

† The General Smith, 4 Wheaton, 443; The Bark Union, 2 Story, 463; The Aurora, 1 Wheaton, 102.

gence in either event must be exercised by the merchant or lender to ascertain that the repairs and supplies were necessary and proper, as the master is not authorized to hypothecate the vessel unless such was the fact within the meaning of the maritime law.*

Such necessity for repairs and supplies is proved where such circumstances of exigency are shown as would induce a prudent owner, if present, to order them, or to provide funds for the cost of them on the security of the ship.†

Proof that the repairs and supplies were necessary will not in any case be sufficient to entitle the furnisher or lender to recover by a suit *in rem* against the vessel if it appear that the master had funds sufficient to execute the repairs and furnish the supplies, and that the party who made and furnished the same knew that fact, or that facts and circumstances were known to him sufficient to put him upon inquiry, and to show that if he had used due diligence he would have ascertained that no funds except such as the master already possessed were necessary for any such purpose.

Good faith is undoubtedly required of a party seeking to enforce a lien against a vessel for such a claim, but the fact that the master had funds which he ought to have applied to that object is no evidence to establish the charge of bad faith in such a case unless it appears that the libellant knew that fact, or that such facts and circumstances were known to him as were sufficient to put him upon inquiry within the principles of law already explained.‡

Express knowledge of the fact that the master had sufficient funds for the purpose is not necessary to maintain the charge of bad faith, as it is well-settled law that a party to a transaction, where his rights are liable to be injuriously affected by notice, cannot wilfully shut his eyes to the means of knowledge which he knows are at hand, and thereby escape

---

* The Paragon, Ware, 336; The Fortitude, 3 Sumner, 225.

† The Grapeshot, 9 Wallace, 141; The Alexander, 1 W. Robinson, 362; The Medora, 1 Sprague, 139.

‡ The Sarah Starr, 1 Sprague, 455.

the consequences which would flow from the notice if it had actually been received; or in other words, the general rule is that knowledge of such facts and circumstances as are sufficient to put a party upon inquiry, and to show that if he had exercised due diligence he would have ascertained the truth of the case, is equivalent to actual notice of the matter in respect to which the inquiry ought to have been made.*

None of these rules, however, have any application to a case where the master had no funds which could be applied to any such object, as the party making the repairs and furnishing the supplies could not know what was not true in point of fact, nor could he be put upon any inquiry in respect to any supposed funds which had no real existence.

Inquiry certainly need not be made as to the necessity for credit if the master has no funds nor any other means of repairing his vessel or furnishing her with supplies, and it is equally certain that proof of failure to institute inquiries is no defence to such a claim even if the master had funds, unless that fact was known to the libellant or such facts and circumstances were known to him as were sufficient to put him on inquiry and fairly subject him to the charge of collusion with the master or of bad faith in omitting to avail himself of the means of knowledge at hand to ascertain the true state of the case.

Whenever the necessity for the repairs and supplies is once made out, it is incumbent upon the owners, if they allege that the funds could have been obtained upon their personal credit, to establish that fact by competent proof, and that the libellant knew the same or was put upon inquiry, as before explained, unless those matters fully appear in the evidence introduced by the libellant.†

Extended discussion of that question, however, is no longer necessary, as the principle is conclusively settled by a recent

---

* May *v.* Chapman, 16 Meeson & Welsby, 355; Goodman *v.* Simonds, 20 Howard, 343.

† The Virgin, 8 Peters, 550; The Phebe, Ware, 265; 2 Parsons on Shipping, 333; The Nestor, 1 Sumner, 73.

decision of this court. Where proof is made of necessity for the repairs and supplies, *or for funds raised by the master to pay for the same,* and of credit given to the ship, a presumption will arise, said the Chief Justice, in the absence of evidence to the contrary, of necessity for credit.[*]

Remarks are found in two cases decided by this court quite at variance with that rule, but it is unnecessary to comment upon those cases or to enter into any explanation of those remarks, as it is clear that if they assert any different rule of decision they are in that respect directly overruled.[†]

Whether the master has funds or not is a matter always known to him, and seldom or never known to merchants in the port selected by the master as a port for relief, unless they obtain it from the master. Masters, if they are honest, will not ask for such assistance when they are supplied with funds, and if they are dishonest they are not likely to communicate any facts to the merchant which would induce him to refuse to make the requested advances.

Inquiry as to the credit of the owners of the vessel, except of the master, would seldom be of any avail unless it was extended to the great majority of the merchants resident at the port of distress, and any rule which should impose that obligation upon the merchant as a condition to his right of action to recover the amount of his advances would in many cases operate as a denial of justice, as he could better afford to lose his claim than to incur the expense of making the required investigation.

Viewed in any light it is clear that necessity for credit must be presumed where it appears that the repairs and supplies were ordered by the master, and that they were necessary for the ship when lying in port or to fit her for an intended voyage, unless it is shown that the master had funds, or that the owners had sufficient credit, and that the repairer, furnisher, or lender knew those facts or one of

[*] The Grapeshot, 9 Wallace, 141; The Barque Mason, 2 Story, 463.

[†] The Grapeshot, 9 Wallace, 141; Thomas v. Osborn, 19 Howard, 22; Pratt v. Reed, Ib. 359; The Sea Lark, 1 Sprague, 571; The Prospect, 3 Blatchford, 526.

them, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry and to show that if they had used due diligence they would have ascertained that the master was not authorized to obtain any such relief on the credit of the vessel. Applying that rule to the present case the conclusion is inevitable that the decree in the Circuit Court was erroneous.*

Decree in the Circuit Court is REVERSED, and the cause remanded with instructions to enter a decree

AFFIRMING THE DECREE OF THE DISTRICT COURT.

---

### NOTE.

Soon after the preceding appeal was decided, two other appeals, both from the same court with it, and with facts which distinguished them little, if at all, from it in principle, were adjudged. They were

---

* Roberts on Admiralty, 210; The Fortitude, 3 Sumner, 268; The Nelson, 1 Haggard, 176.