# U. S. SUPREME COURT.

## The Steamer Patapsco.

1. The steamer Patapsco, a vessel owned or chartered by the Commercial Steamboat Company, a corporation incorporated by the laws of Rhode Island, was engaged in making weekly trips between New York and Baltimore in a line with other vessels belonging to the company.

On each occasion that she started from Baltimore the agent of the company gave written requisitions to Mr. Boyce, a coal miner, who had extensive coal depots at Baltimore, to deliver on board of the steamer (by name) various quantities of coal. Mr. Boyce on receiving the above requisitions gave written orders to his agents to deliver on board of the steamer (by name) the same quantities.

The coal was necessary, indeed indispensible to enable the steamer to make her various voyages. To save useless accumulation of bills, Mr. Boyce tendered one general bill each month to the company (by name) making them debtor to the various accounts. The steamer had no funds to pay for the coal and the company were in an embarrassed state which shortly thereafter resulted in total bankruptcy.

On a libel filed *in rem* by Mr. Boyce against one of the steamships for coal used, it was *held* by the United States district court of New York, (Shipman, *D. J.*) that he had no lien on the steamship for the coal. The United States circuit court, (Nelson, *C. J.,*) reversed the district and *held* that he had and the supreme court now affirm the circuit court holding:

1. That it appearing that the Patapsco was in a foreign port and that the coal was ordered for her *specifically by name* and delivered to the officers in charge of her ; that the coal was necessary, in such a case the inference is that the credit was given to the vessel, unless it can be inferred that the master had funds, or the owners had credit and that the maierial man knew of this, or knew of such facts as should have put him on inquiry.

2. The Lulu (10 *Wal.,* 192*)*, alluded to and approved of.

3. The coal being sold for cash at the lowest market price, it is clear that there was no credit given to the company at the time of sale.

4. When the libellant waived his privilege of cash on delivery and put the coal on board of the steamship, the presumption of law would be that he thereby gave credit to the steamship and not to the owners thereof, inasmuch as the supplies were furnished in a foreign port.

5. If the credit was to the vessel there is a lien and the burden of displacing it is on the claimant.

6. He must show affirmatively that the credit was given to the company to the exclusion of a credit to the vessel.

7. Entries in the books of the party supplying the materials, while they may tend

The steamer Patapsco.

to support either view of the facts of credit according to the entry, yet are not conclusive, and are always expla.nable, and the truth of the transaction can be shown independent of them.

8. The recent decisions of the supreme court in cases of liens sought to be enforced by material men, for supplies furnished to vessels in foreign ports, have had the effect to place liens on a more substantial footing than some previous cases seem have left it.

*Argued March* 21, 1872, *decided May* 6, 1872.

An appeal from the second circuit.

This case came up on appeal from a decree of Mr. Justice NELSON, delivered in the second circuit, reversing a judgment rendered in the U. S. district court for the southern district of New York.

In the district court below, the libellant, a resident of Baltimore, had filed his libel and arrested the Patapsco, a vessel owned or chartered by the Commercial Steamboat Company, a corporation incorporated by the laws of the state of Rhode Island, for coal furnished the said steamboat at Baltimore, in February and March, 1866, to enable her to make her trips between Baltimore and New York, between which ports she was running, under a charter to and in the line of the said company. At that time the title to the vessel was registered in the N. Y. Custom House, in the individual name of Bacon, who was president of the company, and a resident of New York, and so remained until April 2, 1866, (but she was controled solely by the company, on or about which date a bill of sale of her was executed by Bacon to the present claimant, Borland, also a resident of New York; the bill of sale expressing a consideration of $15,000, but as appears by a letter dated April 27, 1866, written by Borland to the libellant, the actual consideration was a claim which Borland held on the vessel amounting to $10,500, and in practical effect he only held the title as security.

. The proofs in the district court below, also established that the supplies in question consisted of six separate deliveries of bituminous coal by the appellant, on board of the Patapsco, on the following dates, viz:

The steamer Patapsco.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1866, | Feb, | 3—40 | tons | 7 | 10 | 284 | 00 |
| " | " | 10—41 | " | 7 | 10 | 291 | 10 |
| " | " | 17—50 | " | 7 | 10 | 355 | 00 |
| " | " | 26—50 | " | 7 | 00 | 350 | 00 |
| " | Mch. | 14—25 | " | 6 | 50 | 162 | 50 |
| " | " | 24—42 | " | 6 | 50 | 213 | 00 |

$1,715 60

It also established that the said supplies were used in the service of the vessel to enable her to make her trips in the line, and were, therefore, necessaries. That at the time the said coal was furnished, the owners of said vessel, the Commercial Steamboat Company, had no other coal at Baltimore, (the port of supply), by which the vessel in question, the Patapsco, could have been supplied for her said trips independent of the coal purchased of Mr. Boyce. And during February and March, 1866, the owners purchased coal of no other person for the said vessel than of Mr. Boyce.

The proofs in the district court below, also established that the supplies in question were ordered by the owners of the line, through their Baltimore agent who had authority for that purpose.

The course of dealing was as follows, viz: the engineers of the different steamships of the company, on their arrival at Baltimore, reported to the agent of the company, what coal or supplies they needed for the particular vessel, whereupon he filled up a printed circular directed to Mr. Boyce (or his deputy did so in his, the agent's, name), to furnish steamship Patapsco, or whichever one it might be, so many tons of soft coal at the time when same was needed, and send invoice therefor. Mr. Boyce then filled up a printed order, in substance directing his agent, to deliver on board steamship Patapsco, so many tons of bitumious coal. On receipt of that order the coal was so delivered on board of the steamship, and vouchers for such delivery taken. At the end of the month a bill was made out of all the deliveries for that

month to the Commercial Steamboat Company, in which the coal delivered during the month is charged to each steamboat, and the bills of coal collected. The object of making out a general bill in that form each month was, as testified to, to save useless accumulation of bills, and for sake of convenience.

The libellant also gave evidence that the coal was sold at the lowest cash price, and that the only credit given was the waiver of the cash on delivery, and rendition of a general bill at the end of the month.

The libellant further gave evidence to show that at the time the coal was sold and delivered by Boyce to the steamship, the company was more or less pecuniarily embarrassed in Baltimore, and that Mr. Boyce knew it.

. This was contested by the claimants, however.

The claimants called for the libellant's journals and ledgers, but did not call for his books of orignal entries. The entries affecting those items of accounts are quoted in Justice DAVIS's opinion hereafter.

The libellant further proved that prior to February, 1866, the Commercial Steamboat Company were compelled to give mortgages on their steamships to the Baltimore & Ohio Railroad Company, on the 6th day of February, 1866, to secure $45,000, the amount of freights. All of this coal was sold after that date.

The libellant further proved, that on the 10th April, 1866, the property of the company, including its steamships (but not the Patapsco), were attached on claims amounting to $132,000 and upwards, in existence in and prior to February, 1866, many of which attachments were for mechanics' liens *in rem.*, and they were finally sold on the 30th June, 1866, and brought not enough to pay those attachments; and since January, 1866, not a dollar of principal or dividend has ever been paid on the capital stock of the company.

The cause was argued before the district court of the U. S., for the southern district of New York, by

DENNIS McMAHON, *for libellant.*
CHARLES DONAHUE, *and* A. J. HEATH, *for claimant.*

SHIPMAN, *D. J.,* dismissed the libel, delivering the following opinion:

SHIPMAN, *J.*—This is a suit *in rem*, to enforce an alleged lien on the steamer Patapsco, for coal furnished her in the months of February and March, 1866, by the libellant at Baltimore.

It is insisted that the coal was a part of the necessary supplies of the vessel furnished at that port, and that it was furnished on the credit of the vessel.

Of the necessity of the coal there can be no doubt. The question in dispute is whether it was furnished on the credit of the vessel.

The steamer was owned by John R. Bacon, at the time the article was furnished, but was running in a line owned by the Commercial Steamboat Company, a corporation chartered by the legislature of Rhode Island. This company had an office in New York, and ran their boat between that city and Baltimore. They had exclusive control of the Patapsco as well as other boats of their line, and must be deemed, for the time owners *pro hac vice.*

This company had an agent in Baltimore, who attended to their business there, including the purchase of the necessary supplies for the steamers which were required at that port.

The steamers, several in number, had been running on this line for several months and the agent had been in the habit of purchasing coal for them of different parties, and among others of this libellant. The amount of coal required for each vessel from time to time was ordered by the company's agent, in writing, the order in each instance designa-

ting to which ship the amount called for was to be delivered. The sales were considered to be cash, but payment on delivery was waived and the bills presented monthly, to the company's agent.

This was done as a matter of convenience and to avoid the multiplication of bills.

Purchases of coal had been made of the libellant from time to time, from December 1865 down to March 24, 1866, the date of the last charge in the account upon which this suit is brought. They were all paid by the agent up to February 1. The bills were made out to the Commercial Steamboat Company, but designating the name of the ship to which each parcel was delivered. That delivered in February and March was not paid for, and the libellant seeks to charge the ship.

Now, in order to do this, the libellant must prove that this coal was furnished on the credit of the ship, and that there was an apparent necessity for resorting to that credit. I think the proof fails on both these points. The libellant dealt not with the master of the vessel, but with the accredited agent of the company, resident in Baltimore. I think that it is clear, that he looked to the company generally and not to the particular ship for his pay. Again, there is no satisfactory proof of a necessity apparent at the time for resorting to the credit of the ship. There is proof that the affairs of the company were, in fact, in a state of embarrassment, and approaching the crisis of insolvency. But the proof fails to show that they had not sufficient credit in Baltimore to obtain supplies required for their ships at that port.

That fact must be clearly proved before this court can assume, that the credit of each ship was or could be resorted to in order to obtain the supplies furnished to such vessel.

The facts in this case, if not exactly the reverse, fall far short of those in the case of *Ross* agt. *The Steamboat Neversink,* where I held the boat liable.

As I discussed the general question of law involved upon principle and authority in the latter case, I do not feel called upon to repeat or enlarge upon that discussion here.

Let an order be entered dismissing the libel, with costs.

From that decree the libellant took an appeal to the circuit court, and the cause was heard before his honor SAMUEL NELSON, associate justice, and was argued by

DENNIS McMAHON, *for the libellant, and*
CHARLES DONAHUE, *for the claimant.*

After advisement Justice NELSON, reversed the district court, and decreed in favor of the libellant, giving the following opinion:

NELSON, *C. J.*—The bill in this case was filed to recover for supplies of coal furnished in the months of February and March, 1866, at Baltimore, to the steamship Patapsco. The only question in the case is, whether or not the coal was furnished on the credit of the vessel, or of the owners, The Commercial Steamboat Company, which run a line of steamers from the city of New York to Baltimore, and occasionally from thence to Charleston. The arrangement was, that the coal should be furnished on the requisition of the engineers of the vessel for cash, but for convenience in making out the bills and transacting the business, they were made out against the vessel once a month and presented for payment. The weight of the evidence is, that Boyce in this arrangement, and time taken to make out and present the bills, looked to the vessel as security in the meantime for the payment of them, and did not intend thereby to rely on the credit of the company. The company was a corporation under the laws of the state of Rhode Island, and, of course, not accessible to him, a resident doing business in Baltimore.

The company had not long been engaged in running this

line of steamers, and had no established credit in that city, and in the months of February and March, when the present supplies were furnished, its credit was not good. Previous to this time, it had been heavily indebted to the Baltimore and Ohio railroad company.

I think the coal in this case, under the circumstances, was delivered and the credit given to the vessel during the interval taken by the common consent and usage of the parties within which to make up the monthly bills, and present them for payment, and that the indebtedness is properly inforceable as a lien upon the vessel against which it was charged.

Decree below reversed, and decree for libellant, with reference.

On that decision a reference was had, and the commissioner reported in favor of the libellant for $1,982 01. To which report exceptions were filed, but after argument the same were overruled and final decree rendered in favor of the libellant for said amount, and interest from July 15, 1868, date of the report, and for costs to be taxed in the district and the circuit courts.

From such decree appeal was taken to the supreme court of the United States, and after a motion was made to dismiss the appeal, which was denied, and is reported in 12 *Wal.*, the cause was heard in the December term, 1871.

CHARLES DONAHUE, *for the appellants and claimants of the steamer.*

I. The claim sought to be enforced here, is nothing short of a running account between a vender and not the owner of the boat, or any one boat, but several vessels, and of a running account against those several boats. It is respectfully submitted that as to the facts in the case of *Pratt agt. Reed*, (19 *How.*, *U. S.*), no one doubted the justice

of that decision, and that it is only the general language and general rule too strongly laid down in that case, that the decision has been modified, and that this case is in all forms with *Pratt* agt. *Reed*, (19 *How.*, *U. S.*)

II. In the case of *Pratt* agt. *Reed*, (19 *How.*, *U. S.*), and all the cases above referred to, the doctrine is established, that for supplies furnished to a vessel in a foreign port, the necessity, render the circumstances stated in the cases, a presumption of credit of the vessel existed, nothing more. We submit, that where the libellant who furnishes the goods is personally examined, no such presumption can be inferred when he does not state or claim that he trusted the credit of the vessel, or that he dealt on her credit.

It is a good and reasonable presumption, that when the libellant's mouth is shut to presume a credit, but when he is examined no presumption should be made.

III. But whatever presumption is to be drawn from the facts required to make such lien, no such presumption exists here; but the contrary is shown:

1st. The goods are not charged to the vessel and although the libellant is sworn this is not explained.

2d. The libellant's book-keeper is sworn and he states that where the vessel is to be charged her name is placed in the account.

3d. The fact is, that the account is a general and running account and made out in the libellant's books against the company itself.

DENNIS McMAHON, *for the libellant and appellee.*

I. The libellant having proven a sale and delivery of coal on board of a steamship, used by it in its navigation in a foreign port, ordered by the owners' agent, the presumption of law would be that the goods were purchased on the credit of the steamship itself, and the claimants must displace that presumption (See Judge TANEY'S remarks in *Thomas*

agt. *Osborne*, 19 *How. U. S.*, citing the *Gen. Smith*, 4 *Wheat.*, 443; *Freeman* agt. *Buchingham*, 18 *How.*, *U. S.* 182; *The Santiago de Cuba*, 9 *Wheat.*, 417).

II. Where the owners of a steamboat need coal for their steamboats, and have no coal on hand for their boats, but actually buy same at the lowest cash price in a foreign port, the presumption of law would be that they had no credit to buy it on their own responsibility otherwise than for cash. If the material man waives the preliminary, cash on delivery, the presumption of law is that he does not do it on the exclusive credit of the buyer, but rather on the credit of the ship to which it was delivered in a foreign port (*The Sea Lark, Sprague's decisions*, 573). There is nothing in the recent case of *Pratt.* agt. *Reed*, to disturb the old doctrine— " tacit lien arises when the circumstances necessary to create it exist."

III. Baltimore being the port of supply is the port of necessity, and in case the company's credit becomes a material element in the lien, its credit in that port must be the standard.

IV. The claimants rely on the entry in the libellant's ledger and the journal entries, as conclusive evidence that the credit for the supplies in question were given to the Commercial Steamboat Company. The original entries in the day-book were not called for by the claimants, but from the journal entries, it is apparent that the day-book entries which are thus journalized were debited to each steamer by name.

Entries in books are always explainable. The truth of the transaction can be shown, independent of the entry. In face of the orders of the goods for the Patapsco by name, and in face of the deliveries on that steamer itself, and of the rendition of bills aggregating the different deliveries to the several steamers by name, and of the evidence proving a delivery on the faith of the implied hypothecation of the Patapsco, the mere entries in the journal and ledger, which

are not the originals, ought not to weigh much on the sub-
ject of a personal credit. 'Even the taking of the company's
note would not create a presumption that the credit was
personal, and would not displace a *bona fide* lien if the note
were surrendered at the trial (*The Guy,* 9 *Wallace,* 758; *The
Kalorama,* 10. *Wallace,* 204).

Nor ought such charges in the books possess as much
weight on the subject of a personal credit, as the fact that
the material man had commenced a common law action for
the claim. Yet, in the *Kalorama* (10 *Wall.,* 204) such
suit *in personam* in a state court was held not to be con-
clusive against a lien *in rem.*

V. To displace the lien, the onus is thrown on the claim-
ant to establish that the sale and delivery of the coal in
question was on the exclusive credit of the Commercial
Steamboat Company (*The Lulu,* 10 *Wall.,* 192).'

This the facts rebut.

Mr. Justice DAVIS delivered the opinion of the court.

Boyce, a coal dealer in Baltimore, filed a libel against the
steamer Patapsco, in the district court at New York, to
recover a demand for six separate supplies of coal, furnished
between the 3d of February and the 26th of March, 1866,
to the steamer Patapsco. One Borland intervened as claim-
ant. The question was whether the coal had been furnished
on the credit of the vessel or on that of her owners only?

The facts as we assume them from the weight of the
evidence, itself somewhat inconsistent, were thus: The Com-
mercial Steamboat Company, a corporation of Rhode Island,
owned and chartered certain steamers, the Kingfisher, &c.,
and used them as a line of steamers from New York to
Baltimore. The Patapsco was chartered by the company
to run on the line, and registered at New York in the in-
dividual name of one Bacon, president of the company;
though the company controlled her. The company had an
agent at Baltimore, and the course of dealing was as follows:

The steamer Patapsco.

When the steamers would arive at Baltimore, their engineers would inform this agent of the amount of coal they needed for their different vessels. Thereupon, the agent would fill up a printed circular directed to Boyce, requesting to furnish "with invoice," to that steamer, by name, (in this case the Patapsco), so many tons of coal; saying nothing about charging anybody. Boyce would then fill up a printed order to his clerk, directing him to furnish the coal to the steamer named. On receipt of this latter order, the coal would be delivered on board the steamer. At the end of a month a bill would be made of all the deliverances to all the boats. The object of making out a general bill at the end of each month, it appears, was to avoid a multiplication of bills and for the sake of convenience.

The entries in the libellant's journal were thus—one example showing all:

BALTIMORE, March, 1866.

COMMERCIAL ST'B'T. CO.:

| 80 tons Geo. C'k, st'r Kingfisher, | $7 | $560 |
| 25 "   "   "   " Patapsco, | 7 | 175 |
| 60 "   "   "   " Kingfisher, | 7 | 560 |
| 42 "   "   "   " Patapsco | 7 | 294 |
| | | $1,589 |

And in his ledger they were thus:

| COMMERCIAL ST'B'T CO.: | DR. | | | CR. |
| 1866. | | Feb. 5th. | By cash | $3,000 00 |
| Jan'y 30th. To coal ac. | $2,896 36 | " 9th. " " | 1,000 00 |
| "   "   " bituminous ac. | 2,963 60 | " 15th. " " | 1,849 96 |
| Feb. " " coal ac. | 790 00 | Mar. 30th. " coal ac. | 73 00 |
| Feb. " bituminous ac. | 2,416 10 | May 5th. " cash. | 136 00 |
| Mar. " coal ac. | 1,550 00 | June 30th. " " | 3,008 41 |
| " " bituminous ac. | 1,589 00 | "   " " balance. | 4,693 79 |
| April " coal ac. | 1,462 50 | | |
| " " bituminous ac. | 65 00 | | $13,761 66 |
| May 16. " cash. | 39 10 | | |
| | | | DR. |
| | $13,761 66 | To balance. | $4,693 79 |

The form of entries in the libellant's day-book did not ap-

pear ; the claimant waiving the production of it, and the bills ·
rendered to the company were not produced.

The coal was sold at the lowest price, and it was necessary
for the Patapsco to make her trips, and was used by her in
making them. The agent of the steamship Company stated
that " the coal bought for the Patapsco was ordered for this
steamer expressly, but on account of the Commercial Steam-
ship Company, the same as all coal was ordered and bought
for the several steamers constituting the line." " The owners
or charterers," he added " were not known in the transac-
tion, but the steamer was supposed to belong to the Com-
mercial Steamboat Company by the parties who furnished
the coal."

During the whole time that this coal was furnished, the
steamboat company was in an embarrassed state. And on
the 3d of February, on which day the first item of the coal
for which the steamer was libelled, was furnished, the steam-
ship company executed six promissory notes for $7,500 each,
$45,000 in all, to the Baltimore and Ohio Railroad Company;
following them immediately, and by the 6th, by mortgages
on three of their steamers to secure payment. And it owed
a balance of $25,800 to the Neptune Steamboat Company
on the 1st of February, 1866, so much remaining due for
money laid out, paid, or advanced in the preceding year.

On the 2d of April, 1866, nine days after the last item of
coal furnished to the Patapsco, the registered owner, Bacon,
executed a bill of sale of her to Borland, already mentioned
as the claimant in the case, to secure to him a debt of
$10,500. And on the 10th following, the company failed
entirely ; the failure being followed by attachments to a
very large amount, much of it, like the $25,800 already
mentioned, for money lent, or debts due, prior to the 3d
February. 1866 ; and the result being a general break up of
the company in which the creditors got but a small portion
of their claim from the whole effects of the corporation.

It was in virtue of his bill of sale above mentioned that Borland contested the libellant's claim.

The district court dismissed the libel; holding that there was no credit to the vessel. The circuit court, on appeal, held that there was, and reversed the decree. From this reversal Borland appealed to this court.

Whether the coal was furnished on the credit of the vessel, or of the owners is the only point of inquiry in this case. The case itself is not without its embarrassments, for the evidence, in some of its aspects, is not consistent with either theory, but the weight of it, in our opinion, enables us to assert the lien against the ship. It is undisputed that the Patapsco was in a foreign port, and that the coal was ordered for her, specifically by name, and delivered to the officers in charge of her. It is equally free from dispute that the supply of coal was necessary—indeed, indispensable—to enable her to make her voyage at all.

In such a case the inference is, that the credit was given to the vessel, unless it can be inferred that the master had funds, or the owners had credit, and that the material man knew of this, or knew such facts as should have put him on inquiry (*The Lulu*, 10 *Wall.*, 192). There is no reason to suppose that the master had funds, or the owners of the line credit, nor that the libellant was guilty of laches. On the contrary, it is in proof that the company which owned the line of steamships was, at the date of these transactions hopelessly insolvent and were borrowing large sums of money on a mortgage of their steamers, away from home, and in the very city where the libellant resided. It would be strange if the libellant did not know this condition of things, and, in the absence of proof on the subject, it is a reasonable inference that he did. If he had this knowledge it would be a violent presumption to suppose that he relied on the credit of the company at all for the supplies which he furnished. The company running the steamers was a distant corporation, of no established name, and without personal liability in case·

the enterprise recently undertaken should prove a failure, and it is hard to believe that a large and intelligent coal merchant in Baltimore, in dealing with this corporation, intended to renounce his claim against the steamers in case he was not paid. It is very clear that there was no credit to the company at the time of sale, because the coal was sold for cash at the lowest market price. And when the libellant waived his privilege of cash on delivery, and put the coal on board the steamship, the presumption of law would be that he thereby gave credit to the steamship and not to the owners thereof, inasmuch as the supplies were furnished in a foreign port. If the credit was to the vessel there is a lien, and the burden of displacing it is on the claimant. He must show, affirmatively, that the credit was given to the company to the exclusion of credit to the vessel. This he seeks to do by the form of charge in the libellant's journal and ledger. If it be conceded that these entries tend to support this position, they are far from being conclusive evidence on the subject. Entries in books are always explainable, and the truth of the transaction can be shown independent of them. The form of charge in any book of original entries does not appear, as the day-book was not called for by the claimants, nor are the "invoices" which the libellant was directed to furnish with the coal produced.

But, from the form of entry in the journal itself (where the amount furnished to each vessel is set opposite to its name), we are led to the conclusion that the day-book entries which are thus journalized were debited to each steamer by name.

If this be so, the journal entries are not inconsistent with the idea of the credit being given on the security of the ship. More especially is this apparent when it is proven that the reason why monthly accounts were made to the steamboat company in bulk was for the sake of convenience, and to save a useless accumulation of bills.

There is nothing besides this journal entry to indicate that

the coal was furnished on the personal credit of the company; and, as the other facts in the case are in favor of a charge direct to the steamship, we do not think the legal inference of credit to the ship is removed.

The lien of material men for supplies in a foreign port is of so high a character that, in the case of *The St. Jago de Cuba*, (9 *Wheat.*), it was protected, along with that of seamen's wages, against a forfeiture which had accrued to the United States; and the recent decisions in this court have had the effect to place this lien on a more substantial footing than some previous cases had seemed to have left it (*Grape-shot*, 9 *Wall.*, 129; 10 *Wall.*, 192, 204.)

On the whole, while we concede, that the case is not free from difficulty, we are not disposed to disturb the decree of the circuit court, in any particular.

Decree affirmed.