Louis L. **EPSTEIN** and Julius Epstein, doing business under the style and trade name of Stratford International Tobacco Company, Plaintiff,

v.

**CORPORACION PERUANA de VAPORES**, Defendant.

**66 Ad. 600.**

United States District Court,
S. D. New York.

April 14, 1971.

**536**

Fine, Lenes & Stieglitz, New York City, for plaintiff by Charles Fine, New York City, of counsel.

Cichanowicz & Callan, New York City, for defendant Corporacion Peruana de Vapores by Paul M. Jones, and Charles E. Smith, New York City, of counsel.

CROAKE, District Judge.

## MEMORANDUM

This is a suit in admiralty brought by the plaintiff, Stratford International Tobacco Company, against the Corporacion Peruana de Vapores to recover a balance of $7,206.50 due on a $13,436.50 purchase of cigarettes and liquor made on May 6, 1965. The facts of the case are as follows.

### I

Plaintiff is a corporation engaged in the sale of tax-free cigarettes and liquor to vessels in the Port of New York (Transcript page 11, line 15). Alfred Parodi is a salesman in plaintiff's employ (11-3). On May 4, 1965 and May 5, 1965, Parodi had conversations with Luis E. Saavedra, the Captain of the S.S. NAPO (one of defendant's ships) (11-17). On May 6, 1965, pursuant to these conversations, Saavedra agreed to purchase 2,270,000 cigarettes totalling $12,251.50 and 40 cases of liquor totalling $1,185.00 from plaintiff. Broken down, the cigarette sales consisted of 1,000,000 Salem cigarettes, 500,000 Kents, 300,000 Lucky Strikes, 200,000 Chesterfield Regulars, 100,000 Camels, 100,00 Half 'n Halfs and 70,000 Montclairs (plaintiff's exhibit #1). The liquor consisted of ten cases of Chivas Regal, ten cases of Old Parr, ten cases of Ye Monks Flagons, five cases of White Horse, two cases of Black & White, two cases of Drambuie and one case of B & B (plaintiff's exhibits #2 and #3).

These goods were delivered to the S.S. NAPO on May 6, 1965, and copies of the invoices for them given to the captain (36-6). However, contrary to its usual practice of cash payment at the time of delivery, plaintiff reluctantly consented to a sale on partial credit as the result of Saavedra's simply not having enough cash to pay for the cigarettes and liquor he had ordered. As Parodi himself later testified, "We were more or less forced into granting credit. * * * I was not aware that credit would occur until the last moment when the captain did not receive the money that he was supposed to have received." (21-8.)

Following delivery of the goods, plaintiff made repeated demands of Saavedra for the $7,206.50 still due on the sale. However, these demands were met only by promises that the money would be forthcoming. When these promises were not met, copies of the original invoices were forwarded to defendant's home office in Peru with a demand for payment. Defendant received these invoices on November 2, 1965 (142-25). Disclaiming all knowledge of the transaction, it refused to pay (143-24), and began an investigation into the conduct of Saavedra (143-21). On December 1, 1965, the captain was discharged by the company (155-17). He died shortly thereafter.

It is not disputed by either party that the master of a vessel possesses full authority to make purchases binding upon the vessel's owner for "necessaries" to be used on board his own ship unless the contrary is clearly stated to all concerned. In describing the origins of this authority, Benedict's The Law of American Admiralty states—

"A ship is, of necessity, a wanderer. She visits shores where her owners are not known or are inaccessible. The master is the fully authorized agent of the distant owners, but is not usually of sufficient pecuniary ability to respond to unforeseen demands of the voyage. These and other kindred characteristics of maritime commerce underlie the practice * * *." Ben-

edict, The Law of American Admiralty, 6th Edition (1940), volume 1, pp. 19–20.

Also, it should be noted that cigarettes have been held to be "necessaries" within the meaning of maritime law. Allen v. The M/V Contessa, 196 F.Supp. 649 (S.D.Texas 1961).

However, the amount of cigarettes and liquor purchased by Captain Saavedra makes it clear that these supplies were not purchased for consumption by the S.S. NAPO alone (64–7). Indeed, plaintiff itself concedes that, in March of 1965 (some six weeks before the transaction in question), the same captain of the same vessel purchased 1,500,000 cigarettes, admittedly "more than what was necessary for the use of the ship." (3–10.)

However, while admitting that the sale in question did not constitute "necessaries" for the S.S. NAPO itself, plaintiff contends that the supplies were purchased by the captain as "necessaries" for other ships owned by the defendant corporation. These cigarettes and liquor, it is claimed, were to be carried by the S.S. NAPO to a home port in Peru where they were to be redistributed to other vessels which had no access to United States ports. Accordingly, it is argued, the captain had authority to make the purchase and defendant should be bound thereby.

Defendant, in turn, denies any knowledge of or authorization for the captain's conduct. It maintains that the captain was never authorized to purchase the supplies in question for his own or any other ship in defendant's fleet, and speculates that the real motive behind the purchase was the captain's participation in a scheme to smuggle tax-free, contraband cigarettes and liquor totally outside the scope of his duties as ship's captain. Accordingly, defendant refuses to be bound by the obligation owing from the captain to the plaintiff, and will not pay the balance due unless so ordered by this court. This court rules as follows.

## II

■ The key question before the court in the instant matter is whether or not the captain of the S.S. NAPO had any kind of authority to purchase the cigarettes and liquor in question and bind the defendant thereby. Clearly, the owner of a vessel is liable for contractual obligations incurred by its master where such obligations were incurred pursuant to either express, apparent, or implied authority. But whether such authority existed in the case at bar is not an easy matter for resolution.

■ It is the judgment of this court that the captain of the S.S. NAPO was clearly without express authority to make the purchases in question. Express authority is that authority which a principal intentionally confers upon his agent by manifestations to him. In the instant case, not only were such overt manifestations lacking; the captain was specifically forbidden to make purchases such as the one in question by the internal regulations of defendant company (See Appendix for English language translations of these regulations—defendant's exhibits A and B). This prohibition was furthered bolstered by defendant's policy of not supplying the captains of its ships with American cash except for that supplied by Hansen & Tidemann (its American agent) for payroll purposes (155–8).

■ The absence of express authority, of course, does not rule out the possibility of apparent or implied authority. Apparent authority is that authority which a principal holds his agent out as possessing or which he permits the agent to represent that he possesses. However, in the instant case, one is hard-pressed to find any such conduct on the part of defendant.

■ Defendant did nothing to encourage the idea that the captain had authority to purchase the supplies in question. Indeed, the testimony of plaintiff's sole witness, Alfred Parodi, reveals that plaintiff never received any requisition forms directly from the defendant corporation nor did it receive purchasing re-

quests from Hansen & Tidemann. Rather, it always dealt directly with the ship's master (106–25, 107–5).

To counter this, plaintiff argues that past transactions of a similar nature established a pattern of apparent authority in the captain to make these purchases. But the evidence fails to link these transactions to the defendant company itself. In most instances, payment was by cash and, in those few cases where payment was by check, the check was not drawn on the account of defendant, but rather by a bank in Peru upon the Chase Manhattan Bank in New York (4–19, 60–14). Thus the court finds apparent authority in the captain also lacking.

■ Plaintiff also claims that the captain of the S.S. NAPO had implied authority to bind defendant to the purchases in question. Implied authority is that authority which comes in conformity either with law or the general business customs of a particular trade.

■ Where conformity with law is concerned, the captain of a vessel has, as previously noted, implied authority to bind the owner thereof to the purchase of "necessaries" for the use of his ship. However, in the instant case, the court is concerned not with the purchase of necessaries for the captain's own vessel, but with the purchase of necessaries for other ships. Thus, the crucial question becomes one of whether or not a captain has implied authority to purchase "necessaries" for a ship other than his own.

This court holds that he does not. A captain is master of his own ship, not of any other. And no definition of "necessaries" dating back one hundred years that this court has been able to uncover holds to the contrary. Hazelhurst v. The Steamer Lulu, 77 U.S. 192, 19 L.Ed. 906 (1870), Pendergast v. The Steamer Kalorema, 77 U.S. 204, 19 L.Ed. 941 (1870). For, while "no hard and fast definition of necessaries can be given, when supplies are furnished to a ship on the order of one in apparent authority, whatever comes within the reasonable requirements, *not of a ship but of the ship to which furnished,* are necessaries." The Lord Baltimore, 269 F. 824 (E.D.Pa. 1921), reversed on other grounds, 273 F. 990 (1921). (Emphasis added.)

■ Thus, plaintiff is left with the contention that the captain had implied authority to purchase the supplies in question because said purchase was in conformity with general business customs. This proposition must also fail.

Plaintiff's witness, Alfred Parodi, testified to the custom of captains purchasing more than their own ships' necessary requirements of cigarettes and liquor and distributing them to other vessels which do not reach the United States (65–23). But there is little else before this court to support the proposition that such a custom actually exists—a proposition which this court declines to accept in view of its earlier finding that a captain does not have implied authority to purchase necessaries for ships other than his own as a matter of case or statute law. And, even if such a custom did exist, one must doubt its applicability to the case at bar. For there is little to show that plaintiff sold the cigarettes and liquor in question to Saavedra in the belief that they would be transferred to other ships belonging to defendant. Indeed, the evidence is to the contrary. Parodi himself testified that, once the goods were cleared with customs and tax agents, his job was at an end and he was "not concerned" with the fate of the goods (111–2).

■ It is the conclusion of this court then, that the captain of the S.S. NAPO was without authority—express, apparent, or implied—to bind defendant to the purchase in question. The record supports the belief that, whatever the purpose of Captain Saavedra in making these purchases, it was outside the scope of his employment by defendant, and plaintiff had no reason to think otherwise. Furthermore, the record supports the inference that the main concern of plaintiff was to make as many sales of tax-free cigarettes and liquor as possible

without regard to where said cigarettes and liquor would ultimately come to rest.

As previously noted, these transactions were virtually always cash transactions (13–14). The record indicates that it was just extenuating circumstances which forced plaintiff to extend credit on this particular occasion (82–20) and, in all probability, it was not until the failure of Captain Saavedra to pay for the goods that plaintiff began to seek a rationale which would bind defendant to the purchases.

To this it should also be added that, even giving plaintiff the benefit of the doubt and conceding that some of the cigarettes and liquor in question were purchased as necessaries for the S.S. NAPO itself, the $6,220 cash payment made by Captain Saavedra would have more than covered the cost of these "necessaries." Also, because the record fails to support the claim that defendant itself ever received or benefited from the supplies in question, there can be no cause of action for unjust enrichment.

The foregoing constitutes the findings of fact and conclusions of law reached by the court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Judgment is hereby directed for the defendant.

So ordered.

APPENDIX

Chucuito-Callao, July 3, 1953

O/I No. 235–53

PERMANENT

FROM    : Manager

TO    : All Captains of the Fleet & Agents of C.P.V.

SUBJECT: Absolute prohibition of orders of materials or supplies or repairs outside Callao without the authorization of the Corporation.—Reiteration.

1. The reiteration of the orders by the Corporation in force to the Captains for that under no circumstances orders of materials or supplies or repairs may be made outside Callao, without obtaining the authorization of the Corporation.

2. First all Captains, after they have received instructions of the Corporation through a mediator, Maritime Superintendence, for the Vo. of the ship under their commend, will order all the Chieves of Department aboard to proceed to make the orders for their Vo. with a margin of security. Such orders, after they have been examined, will be signed by the Captains and sent to the Corporation for their approval.

3. The Chieves of Department on board are responsible that the totality of the orders delivered aboard ship by the Markets of Chucuito and if by chance the order was not completely delivered, they will inform the Captain so that he may request to the Corporation the authorization to purchase in a foreign port the remainder of the order that was not delivered.

4. When a Captain receives the authorization of the Corporation for the purchase of such remaining items in a foreign port, he must

present this order to the Agents of the Corporation with a copy of the authorization attached.

5. The Corporation strictly prohibits, under the Captain's responsibility the adoption of different procedures that contradict these regulations.

## CORPORACION PERUANA DE VAPORES

### Empresa Naviera del Estado

o.204–2/Gerencia

Chucuito–Callao, June 1, 1959

O/I No. 96–59

### PERMANENT

| | |
|---|---|
| FROM | : Gerente |
| TO | : Captains of the Fleet & Agents of C.P.V. |
| SUBJECT | : Absolute prohibition of orders of materials, supplies, or repairs outside of Callao without authorization of the Corporation and supervision of the Agents. |
| REF. | : O/I No. 235–53 July 3, 1953. |

1. On July 3, 1953, the Gerencia issued the reference O/I(a) a copy is attached to this letter.

2. The Gerencia considers that it is necessary to reiterate the content of the O/I, specially paragraph No. 4, that states:

"When a Captain receives authorization from the Gerencia to purchase materials or goods in a foreign port, he must present his order to the Agents of the Corporation with a copy of the authorization of the Gerencia attached."

3. The Agents of C.P.V. are authorized to notify by letter the various shipyards and also the providers that only the payments of invoices for repairs, materials, goods, etc., that have been ordered by the Agents with authorization of the Gerencia, will be given attention to. If opposite, no payments will be made, and the Agents and C.P.V. will no be held responsible to payment of orders made in any other way.

4. The Captains will make reference to the receipt of this present order.

(signed) ERNESTO RODRIGUEZ