Robertson, J.
—Whatever views ought to be entertained of the other questions discussed in the argument of this case, there appears to be a fatal obstacle to the plaintiffs’ right to. recover. The claim is made for an increased rate of freight per ton of the article transported, under and by virtue of an indorsement on the original charter party, which was completely executed, and allowed only sixteen dollars per ton. That indorsement is as follows :
“ It is understood that the rate of freight shall be twenty dollars instead of sixteen dollars, this vessel being included in the stipulations agreed to between the Peruvian Minister at Washington and the Government of the United States.”
By the terms of that treaty, the Peruvian Minister agreed that the American vessels' which left the United States from the 5th of June to 25th of August, then past, in 1852, chartered for loading guano at the Lobos Islands, should be chartered ón account of the Government of Peru, for loading at the Chincha Islands, at the rate of twenty dollars per ton; the owners or charterers indorsing the charter parties to the consignees, or agents of Peru, in the United States. Also, that vessels which might have been chartered in the ports of the Pacific, with the same object, by virtue of orders sent from the United States before the 25th day of August, 1852, and which could not be countermanded afterwards, would also be chartered at the same rate; provided the charter parties should be presented and indorsed to the said agents of' Peru, in the United States, before the first day of January, 1853. The vessel in-question was not mentioned in the list annexed to such treaty. She left the United States in February, 1852; was not chartered for loading guano at the Lobos Islands ; nor when chartered under the charter party in question, was she *211 under charter to any one. There was, therefore, no consideration for the promise indorsed on the charter party; that which, was mentioned was untrue, and there never could have been any consideration for such promise, if it were the contract of the defendants. For this reason alone, the complaint ought to have been dismissed.
Judgment must therefore be given for the defendants, dismissing the complaint with costs.
Hoffman, J.
—The first question is, between whom was the contract contained in the charter party made; who were to perform its reciprocal obligations ? This question is to be considered in the first place, as of the time it was entered into, with the aid of any extrinsic circumstances proper to be regarded in giving it a construction.
That a sovereign state may, in its sovereign character, enter into contracts with its own subjects, or those of other countries, which will be enforced in its favor in the tribunals of either, is an undeniable proposition. (The Republic of Mexico v. Arangoiz, 11 How. Pr. Rep. 2; 5 Duer, 634; The King v. Machado, 1 Bligh. N. S. 60, and the cases cited.)
That there is no co-relative subjection of such sovereign state to the coercion of courts of justice, for enforcing such contract’s, is a position no less clear. (Wadsworth v. The Queen of Spain, 17 Q. B. Rep. 171; De Haber v. The Queen of Portugal, Ibid.; The Duke of Brunswick v. The King of Hanover, 6 Beavan, 1 and 2; House of Lords, case 1; Locke on Attachments, p. 7.) In the first cited case, certain persons had been summoned as garnishees, alleged to have property of the Queen of Spain in their hands, on the ground of a debt for interest on bonds entered into by or on her behalf, by the Queen Regent, for her daughter, the Queen of Spain. It was held that a foreign sovereign was not liable on contracts made in a sovereign capacity. He was the representative of the nation of which he was the head, and no English court could entertain an action against him for anything done, or omitted to be done, in his public capacity as such representative. As the court *212 had no jurisdiction over the person, an attachment of his property, in the hands of another, could not he sustained.
Lord Campbell said: “To cite a foreign potentate in a municipal court, for any complaint against him in his public capacity, is contrary to the law of nations, and an insult which he is entitled to resent.”
A party, then, who explicitly and solely contracts with a sovereign power, contracts upon the basis of there being no other appeal open to him for its acts or omissions butr> its own sense of justice and legal obligation. It may not be assumed that this dependence is less to be regarded, in interpreting his contracts, than the redress through tribunals of justice, afforded to him in other cases.
In examining the charter party in the present case, and with the aid of known public and historical facts, which both counsel have made use of, we find :
That the Republic of Peru did engage as a trader in the shipment of guano from the islands owned by it, and for its own emolument. It placed itself, and it was competent to place itself, in the position of an individual merchant and contractor. It was both legal and consistent for it to enter into a charter party, in which the republic should alone be looked to for the performance of the obligations of a charterer. It is equally clear, that, if it could contract in any other mode, yet, for authentication and proof, the ordinary and natural mode would be, to bind itself through some agency. It follows, that the liability of an. agent executing the contract, is to be deduced from the instrument and circumstances. Whether there is any legal presumption as to such liability, and what that is, is a point hereafter noticed. I am examining the case, at present, on the supposition that there is none ; and that it stands as if the charter party was between individuals. The instrument in question is “ between E. D. Sleeper, master of the bark Golden Era, now in the port of Callao, on the one part; and E. Bareda & Brother, acting agents of the Peruvian government, on the other part.” The vessel is to proceed to Chincha Islands, calling on her way *213 at Pisco, to obtain the necessary pass to load, which shall ’ho given by the charterer’s agents, free of expense. We may here notice, that the government could alone give the pass. Its agents are there referred to. The government is thus recognized as the charterers; at least this clause favors such a view more than any other.
The charterers’ agents are to give notice when the vessel is to receive no more cargo. The charterers are to provide twine. The vessel is to" proceed to Hampton Roads for orders from Messrs. Bareda & Bro., to discharge in Baltimore or in New York, there to deliver the cargo; the consignee having the liberty of naming the dock or wharf at which the cargo is to be landed.
“ The freight to be paid, as under, at the rate of sixteen dollars, in full, per ton of 20 cwt., net weight, of guano; custom house weight.”
There is then a clause, to the effect that the master was to be supplied, in the Pacific, with a sum not exceeding " , which is to be in part payment of freight. Should the charterers, or their agents, advance any further sum, for repairs, stores, &c., it should be considered in part payment of freight; “ and the balance to be paid on the right delivery of the cargo, by approved bills, at months date, or in cash, at the option of the consignee.”
“ The ship to be consigned, in the United States, to F. Bareda & Brother, who will charge two and a half per cent, on the amount of the freight, for managing the ship’s business.”
The signature was “ F. Bareda & Brother.” The indorsement, it is admitted, was made by or on behalf of the defendants. It is as follows : “It is understood that the rate of freight shall be twenty dollars instead of sixteen dollars, this vessel being included in the stipulations- agreed to between the Peruvian Minister, at Washington, and the Government of the United States.”
Its date is not given. The vessel was in New York in February, 1852. When the charter party was made, she was at Callao. The date of this is not given. She was at the Chin *214 cha Islands on the 12th of November, 1852, and was there also on the 10th of December. It is stated in the answer, that Philip Bareda, who alone .resided at Lima, Peru, made the indorsement of the twenty dollars. The vessel arrived at Baltimore, about the 30th of April, 1853. On her outward voyage, she was to go to Panama.
To have been supposed to be within the treaty stipulations,. the vessel must 'have left the United States between the 5th of June and 25th of August, 1852. Time must be allowed then for her passage after th,e first date, and thus the indorsement could not have been made earlier than September. The distance from Callao to the Islands being not over a few days sail, it is far more probable that it was. considerably later.
Continuing the examination of the provisions of the charter party, we find that the party, directly to receive the benefit of the services of the ship, was the Eepublic. The party" receiving the consideration in the treaty stipu- ' lations with the United States, which induced the increase of the charter money, was the Eepublic. All the consideration of the engagements in favor of the owners of the vessel, moved to the Eepublic; none, except the prospect of commissions, to the defendants.
It is -also" td be noticed, that the complaint explicitly avers, that the vessel proceeded to Callao, in the Eepublic of Peru, and there entered into a charter party with the government of said' republic, to bring a cargo of guano to the United States, at the price or sum of $20 per every ton of guano so to be brought. The answer admits this, except as to the rate, which it avers was sixteen dollars at first, and proceeds to state the reason of the increase.
Suppose the vessel had been duly offered at the Islands fit to receive .the cargo, and none had been ready; or the charterers had found it expedient to break the contract, could an action have been sustained against the defend ants ? I think not.
I shall first advert to some authorities bearing upon the question, on the theory, that the fact of the agency of the *215 defendants being for a government, makes no difference in the rule to be applied.
In Lennard v. Robinson, (32 Eng. L. and Eq. Rep. 127, Queen's Bench, 1855,) the action was on a charter party to recover demurrage for the detention of the ship. The charter party was, as to its material portions, as follows: “London, May 4, 1854. It is this day mutually agreed, between Mr. John M. Lennard, owner of the goods, ship, &c., now at Genoa, and Messrs. Robinson and Fleming, of London, merchants, that the said ship, &c., shall sail to Torrevieja, and there load from the factors of the said merchants, a full cargo of salt; cargo to be brought to and taken from along side, at merchants’ risk and expense, which the said merchants hereby bind themselves to ship; and being so loaded, shall proceed to Memel and deliver the same on being paid freight 28s. per ton.” Signed, “by authority of and as agents for M. A. H. Schwedersky, of Memel. Pro Robinson and Fleming.
“W. F. MALCOLM, “JOHN M. LENNARD.”
Lord Campbell said : “ Before the signature to the contract, there is not the slightest intimation that the defendants are not the principals. They appear to be the contracting parties, and they undertake to load the cargo, and to do all that was to be done.” Coleridge, J., observed : “ Many cases have decided, that it is not sufficient to free the parties to a contract from personal liability; that they state in the contract, that they enter into it as agents for another person; but that the whole instrument is to be looked at in order to see whether the contract is made by them as principals or as agents.” He then criticises the stipulations, and concludes they were strong to show that the contract was to bind them personally.
So in Tanner v. Christian, (29 Eng. L. and Eq. Rep. 103, 4 Ellis and Black. 591,) the agreement was between C. for and in behalf of N. of the first part, and T. of the second part; C., On behalf of N., agreed to let the premises, &c.. T. paying rent to C. for the use of N. ; C. signed his own *216 name. It was held, that C. was personally bound. One test was to see, who, by the terms of the contract, was to act in the performance of it. C. was to do all that was to be done.
In Cooke v. Wilson, (37 Eng. L. and Eq. Rep. 361,) the charter party was, “ It is this day mutually agreed, between Messrs. J. & R. Wilson, of Liverpool, owners of the ship Jessica, of the first part, and J. S. Cooke, of London, on behalf of the Geelong and Melbourne Bailway company, of the other part, that the ship should take onboard, <&c., and deliver the goods, &c., along side the pier of the Geelong, &o., company, in Corio. The rates of freight determined upon by the parties to this agreement, are as folloivs : one-third to be paid in London, and the remainder by the said company at the port of Geelong aforesaid.
“ (Signed) J. & B. WILSON,
“ SAMUEL JOHN COOKE. ”.
Crowder, J., said: “ Where a man has signed a contract, he must be taken to be the contracting party, unless on the writing it appears distinctly that he was only acting as an agent. It is said, there is nothing here to show that he was anything but an agent. There is nothing in the agreement to show that he was contracting only on behalf of another, and not himself.” The rule is stated by Cress-well, Justice, in language slightly stronger; but it seems to me that it is laid down by Crowder, with accuracy.
Parker v. Winlow, (7 Ellis and Black. 942,).was the case of an action for demurrage. The charter party was : “It is this day mutually agreed between captain W. Parker, of the good ship Celerity, himself master, and G. M. Winlow, agent of E. Winlow & Son, merchants, that the said ship shall load, &c., and deliver at &c., on being paid freight. The ship to be addressed to E. Winlow & Son, of Devonport.” (Signed) G. W. WINLOW.
The defendant, G. W. Winlow, was not a member of the firm.
Lord Campbell said: The defendant had personally contracted. He had used words to show that he had so con *217 tracted. One could pledge Ms personal responsibility, though agent for another; and the contracting parties here were the plaintiff and defendant. Crompton, J. said: A man, though an agent, may well intend to bind himself personally; and he does so if he contracts without restrictive words to show that he does not mean to do so.
Se also the cases in our own courts cited, Moss v. Livingston, (4 Coms. 208,) and De Witt v. Walton, (5 Selden, 571.) In these, the authority to bind the principal, was doubtful, or had not been exercised in a manner showing an intent to bind him; and the phrase “ agent,” was held as a descriptio persona only.
From these cases, I conclude, that it would be difficult to hold these defendants liable, if the' case is to rest upon precisely the same principles as if it were between individuals. The agency is apparent on the face of the contract, and the principal is known.
' (2.) But if this view of the case, on the supposition of its being a contract between individuals, should be doubtful, yet it seems to me the . fact of the defendants being agents of a government, and so described, is decisive. The rule upon this subject, is thus stated by Chancellor Kent: “ There is a distinction in the books between public and private agents on the point of personal responsibility. If an agent, on behalf of a government, makes a contract and describes himself as such, he is not bound personally, even though the terms of the contract be such as might, in the case of a private nature, involve him in a personal obligation. The reason of the distinction is, that it is not to be presumed that a public agent meant to bind himself individually for the government. And the party who deals with him in that character, is justly supposed to rely upon the good faith and undoubted ability of the government. But the agent, on behalf of the public, may bind himself by express engagement; and the distinction terminates in a question of evidence. The inquiry in all cases is, to whom was the credit, in the contemplation of the parties, intended to be given.” (Comm. vol. 2, p. 632.)
*218 While the inquiry to whom the credit was meant to he given is open, to be tested by the evidence, (mainly of the contract itself,) it is yet clear, upon the cases, that there is a decided presumption that the public agent is not personally liable, and plain testimony is requisite to fix the obligation upon him.
A reference to some of the leading authorities, will establish this. Thus, in Macbeath v. Haldimand, (1 T. R. 172,) the general rule was declared, and it was held, that a commander was not liable for contracts made by him on behalf of his government. And in Unwin v. Wolseley, (Ibid. 674,) the same rule was applied where, the defendant signed a charter party under seal, as commander of his majesty’s ship Magnanime, on account of his majesty. In Hodgson v. Dexter, (1 Cranch. 345,) the lease was between Joseph Hodgson, of the one part, and Samuel Dexter, secretary of war, of the second part. The former leased certain premises to the latter by the name of Samuel Dexter, and his successors. The latter covenanted for himself and his successors, to keep the premises in good repair, and surrender them at the end of the term. The court held that the defendant was not bound. The subject was fully discussed in the case of Macbeath v. Haldimand, and the court considers the principles laid down in that case as consonant to policy, justice and law.
In Parks v. Ross, (11 How. U. S. Rep. 362,) the court say “it is an established rule of law, that an agent, who contracts in the name of his principal, is not liable to arrest on such a contract, much less a public officer acting for his government. As regards him; the rule is, that he is not responsible for any contract he may make in behalf of his government; and wherever his contract or engagement is connected with a subject fairly within the scope of his authority, it shall be intended to have been made officially, and in his public character, unless the contrary appears, by satisfactory evidence of an absolute and unqualified engagement to be personally liable.”
The case of Gidley v. Lord Palmerston, (3 Brod. & Bing. *219 275,) is as strong a case of the application of this rule as can be found. It was held that assumpsit would not lie against the secretary at war by a retired clerk of the war office, entitled to a retired allowance, although the defendant had received the money applicable to such allowances. The money was received as money of the crown, and belonged to it. He could only be responsible to the crown, in his public capacity, fpr it.
(3.) It is next urged by the plaintiffs’ counsel, that the mere reception of the goods rendered the defendants personally liable for the freight. In the case of an ordinary bill of lading, it may be treated that such is the general rule. The clause directing the delivery to the consignee, he paying freight for the same, raises an implied contract to discharge such freight upon the acceptance of the goods. (Roberts v. Holt, 2 Shower, 432; Cock v. Taylor, 13 East. 399; Brouncker v. Scott, 4 Taunt. 1; Wilson v. Kymer, 1 M. & Sel. 157.)
I do not propose to enquire here how far Sanders v. Vanzeller, (4 Q. Bench Rep. 278,) has affected this proposition, and left the point not a clear inference of law, but matter of evidence only. It is not necessary in this case.
It is also well settled, that if the consignor is the owner of the goods, freight may be recovered .of him, when they have been delivered to the consignee without payment. (Tapley v. Martens, 8 T. Rep. 451; Shepherd v. DeBernales, 13 East. 565; Barker v. Havens, 17 John. Rep. 234.)
In the latter case, the master conveying goods under a usual bill of lading, delivered them to the consignees without receiving freight, which, however, he subsequently demanded, and payment was refused. The action was sustained against the consignor, he being the owner of the goods.
In the present case there is no such clause as is usually found in a bill of lading. The parties to whom the guano was to be delivered, were simply the agents of the republic to receive it. The master surrendered a lien upon the property by an unqualified delivery upon receiving sixteen *220 dollars the ton. The omission of the important clause of a bill of lading referred to, the acknowledged character of the defendants as factors only of the republic, the negotiation with them in respect to the extra four dollars, in that capacity, seems to me to prevent the result of a personal liability by reason of the reception of the goods.
(4.) There remains one point which seems the most favorable to the plaintiffs of all that has been presented in support of their claim.
The complaint alleged that the charterers were to bring a cargo of guano to the United States, at the price or sum of $20 for every ton so brought; the performance of their contract, and their right to receive that sum; “ and that the defendants had in their hands, and under their control, the money and means provided for the payment of the aforesaid charter moneys, due and payable as aforesaid.”
The defendants answer, that the rate or price was sixteen dollars per ton, and that the ship was bound to. take the cargo at that rate or price. The answer then sets forth the indorsement as to $20 a ton, and the inducements leading to it; that the representation of the master of the vessel being within the treaty which led to the indorsement, was untrue, and the vessel was not so included; that the memorandum was therefore void; that they paid the master at the rate of sixteen dollars per ton, being the sum of $9,125.55, and took his receipt therefor.
They then “ admit that they had in their hands, previous to the said payments to the said master, certain funds of the said Peruvian government, provided for the payment of the said charter moneys, but no other funds.” They also say, that before notice of the claim of the plaintiffs, and after the settlement with the master, and in reliance thereupon, they refunded to the Peruvian government the funds so held by them. That they have not, and had not at the commencement of the action, any funds of the Peruvian government, that they are or were authorized to apply towards the payment of the plaintiff’s claim.
The evidence of Churchman tends to contradict the state *221 ment, that they had no notice of the claim until after the settlement with the master, and the answer must, I think, be considered as admitting, that the defendants had in hand the amount of the extra'four dollars per ton.
Thus understood, and with the evidence of Churchman, the case is fairly this: The defendants, as agents of the republic, had been provided with funds to meet the whole twenty dollars per ton, anticipated as the amount which would be legally payable. They had reason to suppose that the vessel was not entitled to the extra four dollars per ton, stipulated for in the indorsement. They refuse the payment, and after notice, refund the amount.
It appears to me, upon the whole of the circumstances attending this branch of the case, that the defendants, as public agents, were warranted in the course they have pursued, and were entitled to put the plaintiffs to the proof of the validity of their claim under the treaty, upon an application to the government of the republic. I do not think that these facts are sufficient to render them personally responsible, upon an implied undertaking to pay over the amount, when their own government could certainly make them liable, unless they should assume the office of proving, and succeed in proving, the right of the vessel to receive it.
The learned judge ordered the complaint to be dismissed, and upon an exception, ordered it to be heard at the general term, and judgment suspended.
I think the judgment should be for the defendants, dismissing the complaint with costs.
Pierrepont, J., concurred in dismissing the complaint.
Orderedaccordingly.