CHAFFRAIX *v.* BOARD OF LIQUIDATION and others.[*]

(*Circuit Court, E. D. Louisiana.* March, 1882.)

1. JURISDICTION — INJUNCTION — STATE OFFICERS — CONSTITUTION, ELEVENTH AMENDMENT — ID. § 10, ART. 1.

   The circuit court has jurisdiction to prevent, by injunction, the officers of a state from diverting a fund collected by taxation and set apart under a statute of that state to pay certain bonded indebtedness of said state, to the end that said fund may be preserved intact until the rights of the parties and the interests of the state, if any she has, may be determined contradictorily. Such action is not forbidden by the eleventh amendment of the constitution of the United States, and is necessary for the proper enforcement of section 10 of article 1 of the same instrument. PARDEE, C. J.

2. JURISDICTION—WHEN IT CANNOT BE EXERCISED—WHEN OBLIGOR A NECESSARY PARTY—TREASURY OF A SOVEREIGN EXEMPT FROM JUDICIAL INTERFERENCE EXCEPT SO LONG AS SOVEREIGN CONSENTS TO INTERFERENCE.

   Jurisdiction is ousted only where the state is *eo nomine* a party; but, though the court has jurisdiction, it cannot be exercised where the defendants are merely nominal parties and have no real interest in the controversy.

3. SAME—NECESSARY PARTY.

   When the bill asserts the obligation of a bond or an interest covenant against the obligor or his property, which is controverted by the obligor, he is a necessary party.

   The treasury of a sovereign can be interfered with by judicial process no longer than the sovereign continues to assent to the interference. BILLINGS, D. J.

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

*Henry C. Miller* and *Thomas Gilmore*, for complainant.

*J. C. Egan*, Atty. Gen., *John A. Campbell, W. B. Spencer, E. D. White*, and *James McConnell*, for defendants.

PARDEE, C. J. The bill in this cause is brought by the complainant, a citizen of France, against the defendants, as members of the state board of liquidation, to prevent the diversion of certain funds, collected by taxation under the consolidated bond acts of 1874, to pay the coupons of the consolidated bonds falling due January 1, 1880, which funds are now in the hands on deposit of one of the defendants. It is alleged that these funds are "trust funds," and that the defendants threaten to divert them under authority of the third article of the state-debt ordinance, adopted with the constitution of 1879, reading: "That the coupon of said consolidated bonds falling due the first of January, 1880, be and the same is hereby remitted, and any nterest taxes collected to meet said coupon are hereby transferred to defray the expenses of the state government;" and under act No. 3 of the legislature of 1881, approved January 4, 1882, entitled "An act to provide for the funding of the interest fund now in the hands of the fiscal agent of the state and to accrue, into bonds of the United States government, and to provide for the payment of the reduced interest due or to become due on the bonds of the state," and which act transfers the fund collected to pay the January, 1880, coupons of the consolidated bonds to a reduced interest fund. It will be noticed that this last act is in direct conflict with the third article of the debt ordinance, as the latter transfers the fund to pay the general expenses of the state government, while the former transfers the fund "to pay the reduced interest that is or may become due on state bonds converted or stamped under the ordinance of the constitution of 1879, in reference to the state debt." The said article of the debt ordinance of the constitution, and the said act No. 3 of 1881, are alleged by the bill to be in violation of section 10, article 1, of the constitution of the United States, as impairing the obligations of the contract under which complainant's bonds were issued. The bill prays for a receiver and an injunction.

The question necessary to pass upon at this time is merely whether, under the showing made in the bill, an injunction may issue pending the suit; the only objection urged being that the state of Louisiana is the real party defendant, and that, therefore, the court is without jurisdiction by reason of the eleventh amendment to the constitution. This question has been settled in this court in the case of *McComb* v. *Board of Liquidation*, 2 Woods, 48, and affirmed by the supreme

court, 92 U. S. 531, which was a case arising under the very same act, amendment, and contract as the case under consideration. In that case the defendants sought shelter under the sovereignty of the state as a cover to execute an unconstitutional law of the state; but the courts held that an injunction would lie against them as individuals and as officials of the state, notwithstanding the law or the interest of the state, to prevent them from violating the contract of 1874, and that to such a suit the state was not a necessary party.

If the court has jurisdiction to prevent the defendants from violating the contract between the state and the bondholders by issuing bonds at par, to the detriment of the bondholders' security, what doubt can there be of the jurisdiction of the court to prevent the defendants from diverting the entire security.

No case yet decided in this court denies the jurisdiction to restrain the defendants as individuals from impairing the obligations and securities of the funding acts of 1874.

For my own part I have no doubt that the courts of the United States, if proper cases are made, can prevent any agent of the state, as well as any individual, from diverting a dollar from the fund actually collected under the act and amendment of 1874.

The difficulty is and has been, what use is there in merely tying up the funds? If the bondholders cannot have their dues, why hinder the money from going to pay the expenses of the state? As there is some force in these objections, it is necessary to examine further into the purposes of the present bill.

Every case that has been brought heretofore has been on the theory that the court should compel the levying and collection of the $5\frac{1}{2}$-mill tax provided by act of 1874, or should reach into the treasury of the state and take the moneys of the state and apply them to the payment of the bonded debt of the state, or that the court should by mandatory process carry into full effect the act and amendment of 1874, levy and collect the tax, and pay the bondholders.

The present bill is brought only in relation to such funds as have been levied and collected from the tax-payers of the state under the act and amendment of 1874, and have passed from the tax collectors to the state treasurer, and from the state treasurer to the fiscal agent of the state, where they are now held as a separate and distinct fund, to the credit of the interest fund created by the act of 1874, and is based upon the following propositions of law and fact:

The act of the legislature of Louisiana of 1874, approved January 24th of that year, and the constitutional amendment of 1874, ratified

by the people in that year, created a trust fund of all moneys collected and paid over to the state fiscal agent under the said law and amendment for the purposes therein specified, and of that fund, so coming into his hands, the state treasurer, state auditor, and the board of liquidation became the trustees; the holders of the consolidated bonds, issued under the said law and amendment, became primarily the beneficiaries, the state of Louisiana occupying the position of, and having only the interest of, a debtor who has created a trust for the payment of his creditors, and is not a necessary party to this suit.

These propositions seem to me to have great force and plausibility, and they can be supported by very respectable authority.

That a state, by its legislation, or by its public officers duly authorized, can create a trust, convey property, and appoint trustees, see Perry, Trusts, § 30; *Com'rs* v. *Walker*, 6 How. (Miss.) 143; *State* v. *Rusk*, 21 Wis. 216. That the trustees may be the officers of the state, see Perry, Trusts, § 47, and cases there cited. That the said act and amendment created a trust, see Perry, Trusts, § 82; *Maenhaut* v. *New Orleans*, 2 Woods, 108, and the numerous cases there cited by Judge Woods.

That the state treasurer, state auditor, and the board of liquidation are constituted the trustees, see latter part of section 7 of the act of 1874, and the latter part of the first amendment of 1874.

When the proceeds of the 5½-mill tax, under the act of 1874, reached this board of liquidation, no further act of the state—no order, no appropriation—was necessary. No discretion was given. The money was to be paid to the bondholders, and the law made it a felony to divert it. See section 7 of act of 1874, and article 1 of amendment.

The interest of the state, if she have any, is that of a *cestui que trust* subordinate to the bondholders. If a *cestui que trust* is entitled to a distinct and aliquot share of an ascertained fund, he may maintain a bill against the trustees for that share without joining the *cestuis que trust* of the remaining fund. See Perry, Trusts, § 882, and authorities there cited.

The bill shows that the fund sought to be reached is not sufficient to satisfy the legitimate demands of the bondholders, and the conclusion ought to follow that the state has no resulting interest.

If all the members of the board of liquidation were private citizens, as two of them are, not holding any state office, what doubt could there be among lawyers as to the fiduciary relation of the board to the

bondholders? And, under the authority of a number of adjudicated cases, the fact that the trustees are officials of the state creating the trust would seem to make no difference.

In *Com'rs* v. *Walker*, 6 How. (Miss.) 143, the commissioners of the sinking-fund were held to be trustees of that fund, and liable to sue and be sued, although officers of the state.

In *State* v. *Rusk*, 21 Wis. 216, the bank comptroller of the state was declared the trustee of the securities in his hands, although he was an official of the state, sworn and bonded.

It is elementary that particular formality is not required in the creation of a trust. Any agreement or contract in writing made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property, or a certain fund, shall be held or dealt with in a particular manner for the benefit of another, in a court of equity, raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him, voluntarily or with notice.

And it is said that "equity loves a trust," and that "equity will never allow a trust to fail for want of a trustee."

Now, if the foregoing propositions in regard to the character of the funds levied and collected under the funding acts of 1874, and now in the hands of the defendants, are correct, there would seem to be no doubt as to the power of the court to grant the relief sought in the bill—first, by preserving the funds until an account can be taken, and then by a receiver, as prayed in the bill, distributing the funds to their proper owners.

But there is a broader view that may be taken of the quantum or relief that the courts may grant under the showing made by the bill. There can be no doubt that the act and amendment of 1874 constitutes a contract between the state of Louisiana and the holders of the consolidated bonds issued under said contract. The terms, provisions, stipulations, and agreements contained in said act and amendment leave no doubt on this point. But that the man who reads may know for certain, it is expressly declared in the act, and reiterated in the amendment, that it is "a valid contract between the state and each and every holder of said bonds, which the state shall by no means, and in no wise, impair."

Now, if the main contracting party, the state of Louisiana, were an ordinary individual or corporation, what question could be made against enforcing this contract against all parties in a court of equity? But the state of Louisiana cannot be sued in her own courts without

her consent, nor in the courts of the United States, by any citizen, native or foreign; and this difficulty in the way of putting the parties to the contract on equal terms before the law was obviated by the provision in the amendment that "no court shall enjoin the payment of the principal or interest thereof, (referring to the bonds,) or the levy and collection of the tax therefor. To secure such levy, collection, and payment the judicial power shall be exercised when necessary."

Now, if a constitutional amendment, ratified by a vote of the people, can have any force, it seems as clear as words can make it, that as to the consolidated bonds, and the levy and collection of taxes to pay the interest thereof, and the payment of the interest, the state of Louisiana abdicated and renounced her exemption from suit, and contracted to stand before the courts as an ordinary litigant. And, moreover, provided that the various state officers might be coerced by the courts to perform the various duties devolving upon them under the said act and amendment. Has the state ever repealed or abrogated the contract? If so, when?

The state has defaulted on the payment of interest. She has repudiated five-sevenths of the stipulated interest. She has remitted the coupons falling due January 1, 1880, and has undertaken to appropriate the interest taxes collected to pay the said coupons to other purposes. She has stopped her officers from levying and collecting the tax stipulated in the contract. She has violated her contract, but she has not in terms abrogated it, and she has not yet denied the jurisdiction of the courts "to secure such levy, collection, and payment."

Concede that the state never consented that she might be sued like any other litigant, or that, having so consented, she has revoked her consent; the right to compel her officers to perform their various duties under the said act and amendment has never been revoked, and the courts of the state have entertained, and still entertain, suits to that end.

It is true that the present supreme court of Louisiana, in the case of *Hart* v. *Burke,* has decided that the courts of the state are, under the present constitution, powerless to compel the levy of the tax to pay the interest under the funding act, or to prevent the diversion of the accumulated interest fund collected under said act, and, so far, the state may be said to have revoked; but I deny that there is a scrap of constitution or law declaring a revocation of the declaration in the contract of 1874, that "to secure such levy, collection, and payment the judicial power shall be exercised when necessary."

There is no doubt that if the courts of the state have such power, the United States courts in proper cases have the same power.

But be this question of jurisdiction of the state courts as it may, the contract of the state with the holders of the consolidated bonds cannot be impaired by any law or constitutional provision of the state without violating the constitution of the United States, and any such impairment the courts of the United States are bound to disregard.

Now it may well be that, notwithstanding the consent and renunciation of the state, the federal courts cannot entertain jurisdiction where the state is a necessary party in order to grant the relief sought; and yet, wherever the state is not absolutely required as a party, the courts can act upon the agents of the state to enforce the contract that the state has consented may be so enforced.

To compel the levy and collection of a tax, which is an exercise of sovereignty, may require the presence of the sovereign; but when the tax has been levied and collected, and paid over to the treasurer, and by him deposited and set apart, and nothing remains but a ministerial duty to be performed, what need is there of making the state a party, and why cannot relief be granted by injunction, mandatory or otherwise? See *Davis* v. *Gray*, 16 Wall. 203, and cases there cited, pp. 220 and 221; *McComb* v. *Board of Liquidation*, 2 Woods, 48, and 92 U. S. 531, and cases cited; *Hancock* v. *Walsh*, 3 Woods, 351; *Vose* v. *Trustees*, 2 Woods, 648.

In the leading case of *Osborn* v. *Bank*, 9 Wheat. 738, the state of Ohio had a direct pecuniary interest in the funds reached. The seizure of the funds was her act, and they were carried on her books as part of the general funds in her treasury. Actually the funds were kept separate, but no more so than this interest fund now in the hands of the defendant, the fiscal agent.

The case of *Davis* v. *Gray* was not, as counsel have argued, decided wholly under the law of Texas. The court says: "Upon the grounds of the jurisdiction of both the United States and of Texas, we hold this bill well brought as regards the defendants." And there is no adjudicated case in the federal courts called to my attention that is directly against this view of the case.

The case of *McCauley* v. *Kellogg*, 2 Woods, 13, was a case brought on bonds of the state, where there was no conceded contract that the judicial power might be invoked to secure the levy and collection of the necessary tax and payment of the interest, and the relief sought was to compel the officers of the state to levy and collect taxes.

The case of *Elliott* v. *Nicholls*, not reported, is a very strong case, and well reasoned, but that case was on a bill shaped directly against moneys in the state treasury, and originally against the state itself as a party. The case is now on appeal to the supreme court.

Two cases seem to have carried great weight in the *Case of Elliott* —the celebrated *Banker's Case*, 14 Howell's State Trials, and *U. S.* v. *Guthrie*, 17 How. 284.

The *Banker's Case* was overruled by the house of lords, following the opinion of Chief Justice Holt, and stands as authority only upon the argument of Lord Somers, who practically justified a villainous fraud by sustaining the king's prerogative.

The case of *U. S.* v. *Guthrie* was decided by a divided court, and the judgment was based by four of the judges on the ground that the treasurer of the United States could not be compelled by *mandamus* to pay money from the treasury, although legally appropriated; by four others on the ground that a writ of *mandamus* on the secretary of the treasury was not a legal remedy to try relator's right to office ; Judge McLean dissenting entirely. So that case practically decides nothing, and Judge McLean's reasoning is fully as strong as Judge Daniels', and is more in accordance with the principles of republican government. And Judge McLean cites the case of *Kendall* v. *U. S.* 18 Pet. 608, where a *mandamus* was allowed against the postmaster general, as settling the question. And the case of *U. S.* v. *Schurz*, 102 U. S. 378, seems to settle the question again, that an executive officer of the United States, even a cabinet minister, may be compelled by *mandamus* to perform a ministerial and positive duty.

It seems to me to go without argument that the ministerial and positive duty of the defendants to pay the relator's coupons is just as plain as it can be made.

The case of *Hart* v. *Burke*, 33 La. Ann. 499, "simply decides that under the laws, jurisprudence, and system of practice prevailing in this state and regulating the powers of Louisiana courts, the remedies invoked by the plaintiff in these cases are such as no courts of this state possess or ever possessed the power to grant in a proceeding of the character of that presented;" in other words, that the state courts have no jurisdiction. The court repudiates attempting to pass upon the bondholders' rights under the funding acts of 1874, or upon the jurisdiction of the United States courts in the premises.

It is easy to see that judges holding under the Louisiana constitution of 1879 might feel powerless to carry out contracts which they consider are repudiated by that instrument.

The attorney general of Louisiana, in argument, takes the position that the state of Louisiana has declared that she does not owe. these coupons of 1880, and that if her officers can be made to comply with the acts of 1874, the eleventh amendment to the United States constitution is so much waste paper.

The first proposition is not true in fact, for the state of Louisiana has never declared that she does not owe these coupons; but, on the contrary, her indebtedness is admitted by the terms of the state-debt ordinance, and the other proposition is *non sequitur*. Article 1, § 10, Const. "No state shall pass any law impairing the obligation of contracts," is the clause of that great instrument that is in danger of the waste basket if the constitution of Louisiana of 1879 is given the force that the representatives of the state claim for it.

It seems to me that many of the doubts arising with regard to the ability of the court to grant relief come from following decisions rendered either with a view of maintaining the kingly prerogative, or respecting the rights of some independent sovereignty.

It is said that in England the arms of equity are short against the crown's prerogatives, and that they are short in this country against the sovereign. But the fact is that in this country no person, or set of persons, is above the law of the land, and in the courts of the United States "the arms of equity are never short" when the proper parties can be brought before the court, so that justice may be done according to equity and good conscience. It is not the interest of the state that defeats the case under the eleventh amendment. The court can grant relief in all cases where the state is not essentially necessary as a party.

From what has been shown herein it seems that the court may not be powerless to grant final relief in this case, either by holding the fund now in the hands of the defendants to be a trust fund, and ordering the distribution thereof through a receiver, or, by a broader view of the case, enforcing the performance of the contract by mandatory injunction; and that, therefore, the preliminary injunction prayed for should be granted.

"If there be a *prima facie* or even a doubtful case shown, it is the interest of both parties that the interlocutory injunction should issue." Justice Grier, 3 Wall. Appendix, 791. See Justice Bradley in *Railroad Co.* v. *Drew*, 3 Woods, 676.

"On a motion for a preliminary injunction the court is not bound to solve doubtful and difficult questions of law." *Parker* v. *Sears*, 1 Fish. 93.

Particularly is this the case when nearly the identical question is now pending before the supreme court, whose decision I have no desire to forestall, but which the defendants may render nugatory unless the preliminary injunction is granted.

I think the injunction prayed for should issue, but I decide nothing further in this case than that this court has jurisdiction, under the bill as shaped, to prevent by injunction *pendente lite* the defendants from diverting the fund collected and set apart, under the funding act of 1874, to pay the coupons of the consolidated bonds falling due January 1, 1880; and that such injunction ought to issue, to the end that the fund may be preserved intact until the rights of the parties, and the interest of the state of Louisiana, if any she has, may be determined contradictorily.

The other questions discussed herein are open questions.

Let the injunction issue *pendente lite*, and let the defendants demur, plead, or answer, as counsel may advise, by the third Monday in April next.

BILLINGS, D. J., *dissenting.* In the case of *Elliott* v. *Nicholls* I gave my reasons fully why the court had no jurisdiction over a cause similar to this. After a review of the authorities I distinguished that case from those cognizable by the courts, and stated my conclusion as follows:

"In the case of *Osborn* v. *Bank*, 9 Wheat. 738, the court issued an injunction to protect a bank and its vaults from trespass; in the case of *Davis* v. *Gray* the writ was granted to protect the owner of a tract of land from having his title clouded by wrongful location of warrants upon it; in *McComb* v. *Board* the court, at the instance of the holders of certain bonds, restrained the members of a board of liquidators from injuriously affecting their value, in violation of the contract under which they had been accepted, by issuing similar bonds to parties not entitled thereto; and in the case of the *Louisiana State Lottery Co.* v. *Fitzpatrick*, 3 Woods, 222, at the last term, this court issued an injunction to protect from destruction the franchise of a corporation and their rights of property vested under a legislative grant. It is true that in all these cases the parties restrained were officers of a state, acting under a law of a state which impaired the obligation of a contract, and was therefore unconstitutional and void. But in all these cases the thing which was sought to be protected was by law subject to the control of the courts. The principle controlling all these cases was that courts will enjoin or command those who are

acting· under a void law as if there was no such law. The limitation which this case gives rise to is not to the principle, but to the authority of courts to apply it. The insuperable obstacle lies in the exclusive control which, by the constitution and laws of the state of Louisiana, is vested in its auditor and treasurer over the fiscal administration of the state, and the incompetency of courts of justice to exercise jurisdiction over it.

"The court has not attempted to determine any question pertaining to the morality or the statesmanship involved in the matters presented by this bill of .complaint. I simply find that the judicial authority does not embrace this cause."

In this case the bill is substantially the same as that in the *Elliott Case*. The averments may be concisely stated as follows: The state of Louisiana, in the year 1874, by legislative act and constitutional amendment, authorized the issuance of coupon bonds to redeem its outstanding indebtedness, and appropriated certain revenues to pay the maturing coupons. Some of the revenues so appropriated had been collected, and were held in the treasury of the state, when the state, by its new constitution, directed that they should be destined to another purpose, and they were delivered by the officers of the old treasury to those of the new treasury under the mandate of the new constitution, under which the latter officers were elected.

It is to these funds in the treasury of the state that the complainants claim a title, and they ask from the court an injunction that the treasury officers be restrained from giving effect to the destination of these funds in the treasury of the state in accordance with the constitution of the state, because they say it is a violation of the hypothecation which the state made to them.

The constitution of the state limits taxation to six mills on the dollar; and it is palpable that the enforcement of the complainants' claim will affect the ability of the state to provide funds for the maintenance of its levees, and its schools, its police and sanitary measures.

The complainant asks this court to deal with moneys in the treasury of a state, and to compel the observance of an appropriation of moneys so in the treasury of a state in spite of the state's expressed purpose to recede altogether from her promise and appropriation, and to use the moneys so in her treasury for the ordinary governmental purposes.

Chief Justice Marshall states in *Georgia* v. *Madrazo*, 1 Pet. 122, that in *U. S.* v. *Peters,* 3 Dallas, 121, the court laid down the principle that the courts of the United States are bound to exercise ju-

risdiction if the state be not necessarily a party. This evidently is what the court means in *Osborne* v. *Bank,* 9 Wheat. 738, when it says:

"The state not being a party on the record, and the court having jurisdiction over those on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants, whether they are to be considered as having a real interest, or as being only nominal parties."

The court proceeds to solve the question by the rule of pleading, which would determine the matter if the state had been an individual. In that case the plaintiff was pursuing his property in the hands of trespassers, who had wrongfully taken it from his possession. The being who had authorized the trespass, and who was ultimately to be benefited by it, was not a necessary party. Detinue, the court say, would have lain against the takers alone, if the property had had ear-marks. Being incapable of identification, resort to equity was allowable. But in this case the claim of the plaintiffs arises upon bonds which have interest covenants which are secured by statutory promises as to moneys which have come into the hands of the defendants as agents of the obligor. The plaintiffs here claim the moneys by virtue of the bond. This bill shows that the obligor controverts their right alike to the interest and moneys. The question here is this: Can the plaintiffs assert the interest covenants against the obligor or his property without making him a party? He is clearly a necessary party.

I do not understand that the case of *Davis* v. *Gray* has attempted to change the rule recognized in these cases and enforced in *Governor* v. *Madrazo.* The result of all the cases is that only where the state is *eo nomine* a party is jurisdiction ousted; that when the state is not by name a party, and when the court has jurisdiction over the parties defendant, that jurisdiction cannot be exercised when the defendants are merely nominal parties, and have no real interest in the controversy. *McCauley* v. *Kellogg* was, in all its features, similar to this case. There it was attempted, through the same officers here defendant, to enforce the payment of coupon bonds issued by the state. In that case Justice, then Judge, Woods held that the court could not take cognizance of the cause. He says, page 21, "that case is clearly distinguishable from the cases of *Osborne* v. *Bank* and *Davis* v. *Gray.*" And on page 22: "The dilemma is this: If the suit is against the defendants in their official character, and the claims made upon them are in their official character, the state may be considered a

party to the record. *Governor of Georgia* v. *Madrazo*, 1 Pet. 110. If the suit is against the officers as individuals merely, and the offices they hold are given merely to describe their persons, they have no interest in the subject-matter, and no decree should go against them."

To do what this bill of complaint asks the court to do, would be to wipe from the treasury of a state every vestige of a public treasury, and substitute the court's administration of a state treasury for that of a state. It is not simply shown that this cause affects the interests of the state, but it subverts her constitution to the extent of taking from her treasury, in behalf of her creditors, moneys which her constitution declares they shall not receive, and thereby withdraws them from an employment which the state now declares public good requires. The very statement of this case shows that the state is the sole, real defendant, and that no judgment could be rendered against the defendants personally, or except as representing the state by virtue of the offices which they are declared to hold. Nor is there substantial ground for the argument that there exists here a trust in behalf of the complainants which a court of equity ought to enforce. We must take the case as we find it.

It avails nothing that the complainant in his bill, in his averments, uses the words "that there is a trust fund." The equity of the bill must be determined by the *facts* as they appear, (*Greenville Murray* v. *Earl of Clarendon*, Law R. 9 Eq. Cas. 11;) and, by the facts as they appear, these funds were at one time agreed to be devoted—appropriated in advance—to the payment of these coupons; but subsequently, and before the election of the fiscal officers who are defendants here, the state recalled that appropriation, and these defendants never held these funds for the plaintiffs, but they were placed in their hands specifically to be used for other purposes; so that the case shows (1) that even if the state had not changed the destination of the funds its officers would have held them as his agents, and not as trustees for the plaintiffs; and (2) that so far from receiving the funds for the plaintiffs, they received them to be applied in a way utterly inconsistent with any right to them on the part of the plaintiffs.

The effort of the plaintiffs is to subject the funds, not to the application in accordance with the defendants' undertaking, but in spite of it. The *gravamen* of the bill is, not that the state did place these funds in the defendants' hands for them, but that the state, by her contract, was obliged to have done so, but did not do so.

If the state were a natural person, and her obligations could be enforced as can those of an individual, there would be no difficulty in compelling her to undo her diversion of these funds. But the fact that a sovereign has taken funds which she had agreed should be paid to her creditors, and placed them in her treasury to be disbursed otherwise, could never be the ground for any serious argument that, against the will of the state, they could be followed into the public treasury, and the claim of the creditors enforced in a suit against the treasury officers as naked trustees of the creditors. There can be found some cases which have held that when the sovereign had appropriated a sum of money in the treasury to John Smith, by name, and stood upon such appropriation, John Smith could assert title thereto in a suit against the treasury officers alone; but where, as here, the sovereign had made an appropriation and subsequently recalled it, took the money appropriated, and delivered it to its treasurer to be held and disbursed for other purposes, the creditor is remediless in the courts, for the reason that the treasury of a sovereign cannot be interfered with by judicial process, except the sovereign continues to assent to the interference. The facts of this case show that the money is now held by the state of Louisiana in its treasury, and that the purpose of the state at the time this suit was instituted, as expressed through its people in the form of its organic law, was and now is that this appropriation shall not be observed. With such facts appearing the case fails, no matter how great may be the moral obligations it presents, because courts lack the power to compel sovereigns to execute their contracts.

In *Allen* v. *Barida*, 7 Bosw. 212, Judge Hoffman, speaking with reference to a charter-party entered into with the republic of Peru, says:

"A party who explicitly and solely contracts with a sovereign power, contracts upon the basis of there being no other appeal open to him for its acts or omissions but its own sense of justice and legal obligation."

In *Crouch* v. *Credit Foncier of England*, Law R. 8 Q. B. 384, the court says:

"Foreign and colonial governments frequently create a public debt, the title to portions of which is made to depend on the possession of bonds expressed to be transferable to the bearer or holder. There can hardly properly be said to be any right of action on such instruments at all, though the holder has a claim on a foreign government."

In *Wadsworth* v. *Queen of Spain*, 17 Q. B. 171, certain persons had been cited as garnishees. It was held that a sovereign was not liable

on his contracts made in his sovereign capacity; that no English court could entertain an action against him for anything done or omitted to be done in his representative capacity; and, as the court had no jurisdiction to adjudge against them, an attachment of his property could not be sustained. See, also, *Greenville Murray* v. *Earl of Clarendon*, Law R. 7 Eq. Cas. 11.

In *Smith* v. *Weguelin*, Law R. 8 Eq. Cas. 198, where the government of Peru contracted a loan, and hypothecated for its payment, among other things, all the Peruvian guano imported into Great Britain, and a bill was filed to charge the agents through whom the importation was made as trustees, page 213, the court says:

"Suppose a palpable breach of the contract between the Peruvian government and the bondholders, and that the Peruvian republic declared that it would not pay a penny to any of the bondholders, but would totally disclaim and repudiate all liability, could this court interfere? Some of the states of North America negotiated loans partly here and partly at home, and afterwards repudiated them, but no one ever attempted to seize any property belonging to those states in this country, and enforce a contract between those governments and the holders of their bonds. And if the court did make such an attempt, it would fall into this dilemma: either it would simply make itself ridiculous in attempting what is impossible, or if it could assume that the foreign government was answerable to this court, and bound to pay according to its decrees, and then found property belonging to the foreign government in this country, it would alter the relation between the two countries, and enable a bondholder, by aid of the court of chancery, practically to declare war against a foreign country; for it is clear that if the court of chancery could seize all the guano belonging to the Peruvian government, it might as well seize Peruvian vessels, under the article which declares that all the other property and sources of revenue of the republic should be applicable to payment of the loan."

The case of *Twycross* v. *Dreyfus*, Law R. 5 Ch. Div. 605, is instructive as showing how powerless is a creditor to enforce an hypothecation of property by a suit which is really against a government. There the republic of Peru had issued bonds and agreed to consign, and had consigned, guano to the defendants to meet the annual interest. The plaintiffs, as holders of the bonds, brought an action in behalf of themselves and all other bondholders, and averred that the republic had forwarded large quantities of guano to the defendants for the purpose of paying the interest on the bonds, which they refused to apply for that purpose, and threatened to apply in satisfaction of a lien claimed by themselves, and that the republic of Peru made no claim to the proceeds of the guano.

The court held, affirming the decision of the vice chancellor, that the defendants were agents and could not be sued in the absence of their principal. The master of rolls (page 616) says:

" The first and most important point we have to decide is, what is the meaning of the bond of a foreign government, given to secure the payment of a loan? As I understand the law, the municipal law of the country does not enable the tribunals of this country to exercise any jurisdiction over foreign governments as such. The result, therefore, is that these so-called bonds amount to nothing more than engagements of honor, binding so far as engagements of honor can bind the government which issues them, but are not contracts enforceable before the ordinary tribunals of any foreign government, or even by the ordinary tribunals of the country which issued them, without the consent of that country."

Lord Justice James says, (page 618:)

" You cannot sue the Peruvian government, and it would be a monstrous usurpation of jurisdiction to endeavor to sue a foreign government indirectly by making its agents in this country defendants."

In *The Parliament Belge*, Law R. 5 Prob. Div. 197, the court of appeal held that a public ship of a foreign state could not be libelled for a collision, upon the ground that a sovereign could not be even indirectly impleaded by a proceeding *in rem* against his property.

In *Briggs* v. *The Light Ships*, 11 Allen, (Mass.) 157, it was held that when there was under the law of Massachusetts a builder's lien against the vessels, after they were purchased by the government of the United States, it could not be enforced against the ships, even by a proceeding *in rem*. The court say:

" The immunity arises not because they are instruments of war, but because they are instruments of sovereignty, and that the courts of that commonwealth could not entertain jurisdiction of these petitions."

After holding that there was a lien, and that as matter of title plaintiffs' right was complete with reference to its enforcement, the court, at page 162, say:

" It is an elementary and familiar principle of English and American constitutional law that no direct suit can be brought against the sovereign in his own courts without his consent. In the older books this is often put upon the technical ground that all judicial writs, being in the name of the king as the fountain of justice, the king cannot by his own writ command himself. But the broader reason is that it would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of the sovereign to subject him to repeated suits as a matter of right, at the will of any citizen, and to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on the government in war and peace, and the money in his treasury."

These authorities, it seems to me, are conclusive upon the point that the general doctrine is that the contracts of sovereigns cannot, without their consent, by direct suit, be enforced in the courts neither by process which shall operate directly upon their property, much less upon their treasury, nor by proceedings against their agents alone, whose interest in the subject-matter of the suit is merely nominal, and against whom the court ought not to proceed to make a decree.

This, with perhaps the exception of causes in the admiralty, is the precise meaning and effect of the eleventh amendment of the constitution of the United States, which withholds the judicial power from any suit in law or equity against one of the United States by a citizen of another state or by an alien.

Nor has there, in my opinion, been any submission of the state to the jurisdiction of the courts which has not been withdrawn. It is not necessary to interpret the meaning of the amendment of the constitution of the state of Louisiana, that "the judicial power may be used to enforce the levy or collection of the tax, and the payment of the bonds and interest." The constitution of 1879, with its ordinances, declares that "the coupons falling due January, 1880, were remitted, and the interest collected to meet them was thereby transferred to defray the expenses of the state government;" and the constitution of 1879 further declares that "it supersedes that of 1868, and all amendments thereto." It then, equitably or inequitably, annulled that amendment to the constitution which gave any right to resort to the courts, and has thereby necessarily withdrawn all permission to bring suits directly or indirectly against the state contained in the annulled amendment.

In *Beers* v. *State*, 20 How. 529, the court say:

"It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts or in any other without its consent and permission; but it may, if it thinks proper, waive the privilege and permit itself to be made a defendant in a suit by individuals or by another state; and, as this permission is altogether voluntary on the part of the sovereignty, it follows that it may provide the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires."

My conclusion is that according to the principles which govern all courts in defining the limits of their jurisdiction, as well as the provisions of constitutional law which limit the jurisdiction of the circuit courts of the United States, this case is palpably beyond judicial cog-

nizance. Human tribunals, like their authors, are but imperfect organizations. They are compelled to allow cases of wrongs without being able to afford redress, because their authority is bounded by rules which have been established as necessary for the wise administration of governments. It is not out of regard to kingly prerogatives that sovereigns are exempt from judicial power, but because the necessities and protection of their whole subjects or citizens are involved in the immunity. It is better that a single creditor, or class of creditors, should go unpaid, even when his demand is most sacredly founded, rather than that a whole people should be embarrassed, and an entire government crippled, by the assumption on the part of courts of the power to administer the treasury of a state. If there is a principle which is admitted beyond all others in the doctrines of American government, it is that the people of a state have a right to change its constitution. This has here been done, and in making that change such obligations have been disregarded and such barriers created that to entertain this bill of complaint is to subvert the entire economic and financial system of a state by an administration of the treasury of the state of Louisiana through a receiver of this court.

In my opinion the wrong here complained of, and which the complainant seeks to have redressed, is that of a state, in a case where judicial redress is inconsistent with the settled principles which apportion authority among the departments of government. The case in all its features—in its cause and cure—is essentially political and not judicial. The enforcement of the provision of the constitution which guaranties to every state a republican form of government, as it seems to me, is not more unmistakably outside of the judicial power than is the application of the provision that no state shall pass any law which impairs the obligation of a contract to such a case as this. The contract is clear, the violation is clear; but you cannot call the state to the bar of the court, nor by a bill in equity remodel its constitution.

Unless the substance and force of the eleventh amendment be disregarded, this court can grant no relief in this case. In my opinion the injunction should be refused.

## NOTE.

EXTENT OF JUDICIAL POWER.    The provisions of article 11 of the amendments to the constitution of the United States were held to extend to all pending suits, as well as to future cases,(a) but only to original suits, and not appeals or writs of error,(b) nor to suits of admiralty or maritime jurisdiction.(c)    The amendment is limited to suits in which a state is a party to the record,(d) or where its chief magistrate is sued in his official character.(e) The mere fact that a state officer, whatever his grade, is a party, does not defeat the equity jurisdiction of the United States circuit court, although the state may be the real party in interest, and cannot as such be brought before the court.(f)    This amendment provides that no suit shall be commenced or prosecuted in a federal court against a state,(g) the jurisdiction in original suits against a state being conferred by the constitution on the supreme court of the United States.(h)    But it does not apply to a case where a state becomes interested in the title to property in possession of an individual,(i) although as an independent sovereign it cannot be sued.(j)    So the United States cannot be sued.(k)    So, if a state be not necessarily a defendant, although its interests may be affected, this amendment does not apply,(l) as to a suit against a corporation, although the state be a member thereof;(m) for a state, by becoming interested in a corporation, lays down its sovereignty so far as respects the transactions of the corporation.(n)—[ED.

(a) Hollingsworth v. Virginia, 3 Dall. 378; Georgia v. Brailsford, 2 Dall. 402; Cohens v. Virginia, 6 Wheat. 294. See McNutt v. Bland, 2 How. 27.

(b) Cohens v. Virginia, 6 Wheat. 264.

(c) Olmstead's Case, Bright, 9; Georgia v. Madrazo, 1 Pet. 127.

(d) Osborn v. Bank, 9 Wheat. 738; Chisholm v. Georgia, 2 Dall. 419; Cherokee Nation v. Georgia, 5 Pet. 1; U. S. v. Peters, 5 Cranch, 115; Davis v. Gray, 10 Wall. 203; Swasey v. N. C. R. Co. 1 Hughes, 1; S. C. 71 N. C. 571. See Buckner v. Striet, 7 Bank Reg. 266.

(e) Georgia v. Madrazo, 1 Pet. 123.

(f) Osborn v. Bank, 9 Wheat. 738; Murdock v. Woodson, 2 Dill. 204.

(g) U. S. v. Peters, 5 Cranch, 139; Osborn v. Bank, 9 Wheat 738; Cohens v. Virginia, 6 Wheat. 264.

(h) New Jersey v. New York, 5 Pet. 288; Oswald v. New York, 2 Dall. 415; Grayson v. Virginia, 3 Dall. 320; Huger v. South Carolina, Id. 339; Rhode Island v. Massachusetts, 12 Pet. 731.

(i) U. S. v. Peters, 5 Cranch, 115; Osborn v. Bank, 9 Wheat. 738.

(j) Osborn v. Bank, 9 Wheat. 738.

(k) St. Luke's Hospital v. Barclay, 3 Blatchf. 264.

(l) Fowler v. Lindsey, 3 Dall. 411; New York v. Connecticut, 4 Dall. 1; U. S. v. Peters, 5 Cranch, 139; Osborn v. Bank, 9 Wheat. 738; Louisville, etc., R. R. v. Stetson, 2 How. 550; McNutt v. Bland, 2 How. 27.

(m) Bank of U. S. v. Planters' Bank, 9 Wheat. 904.

(n) Briscoe v. Bank, 11 Pet. 324; Darrington v. Bank, 13 How. 12; Curran v. Arkansas, 15 How. 309.